UNITED STATES DISTRICT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-2116-CIV-HUCK

NIGHT BOX
FILED

AUG 29 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

FOSTER CHILDREN BONNIE L., by and
through her next friend Donald Hadsock;
REGGIE B. and REBECCA B., by and through
their next friend Danielle Roussel;
LAURIE S. and LILLIE S., by and through
their next friend Danielle Roussel;
LESLIE F., by and through her next friend
Brenda Shapiro; SANDRA M., by and through
her next friend Danielle Roussel; TANYA M.,
by and through her next friend Danielle
Roussel; CANDICE D. and JAY D., by and
through their next friend Lori A. Haythorn;
MATTHEW I., by and through his next friend
Danielle Roussel; HUGH S., by and through
His next friend Danielle Roussel; LEANNE G.
and TAMMY G., by and through their next
friend Danielle Roussel; ELAINE R., by and
through her next friend Kristi Kassebaum;
PAUL B., by and through his next friend
Danielle Roussel; RACHEL C., by and through
her next friend Danielle Roussel; CATHY W.,
by and through her next friend Danielle
Roussel; LARISSA C., by her next friend,
Rhoda Goodson; JOHN J., by and through
his next friend Mary Miller; MELINDA and
KARINA, by and through their guardian ad
litem Brenda Shapiro, on behalf of
themselves and all other similarly
situated children,

     Plaintiffs,

v.

JEB BUSH, as Governor of the State
of Florida; KATHLEEN KEARNEY, as
Secretary of the Florida Department
of Children and Families; CHUCK BATES,
JOHN AWAD, ESTER TIBBS, LEE JOHNSON,
LYNN RICHARD, DON DIXON, ROBERT MORIN,
FRAN GIBBONS, PAUL BROWN, CHARLES AUSLANDER,
CHRISTINE DAVENPORT, PATRICK HOWARD,
SUE GRAY and VERN  MARTIN, each as a
District Administrator of the Florida
Department of Children and Families,

     Defendants.

_____/

AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF
CLASS ACTION

## A. INTRODUCTORY STATEMENT

1. Plaintiffs, Foster Children, on behalf of themselves and all other children in Florida foster care, sue Defendants Jeb Bush, as Governor of the State of Florida; Kathleen Kearney, as Secretary of the Florida Department of Children and Families [DCAF]; and Chuck Bates, John Awad, Ester Tibbs, Lee Johnson, Lynn Richard, Don Dixon, Robert Morin, Fran Gibbons, Paul Brown, Charles Auslander, Christine Davenport, Patrick Howard, Sue Gray and Vern Martin, each as a DCAF District Administrator. [In this paragraph and hereafter, the terms "foster child" and "foster care" are used to include children in Defendants' custody based on either an allegation or an adjudication that the child is abused, neglected, abandoned, surrendered or voluntarily placed with Defendants, and specifically includes foster care, shelter care, independent living and pre-adoptive and adoptive placements]. Plaintiffs allege:

2. This is an action for declaratory and injunctive relief, brought pursuant to 42 U.S.C. § 1983, for redress from Defendants' acts and omissions in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; the First and Ninth Amendments to the United States Constitution; provisions of the Adoption and Safe Families Act; the Early, Periodic Screening, Diagnosis and Treatment ("EPSDT") provisions of the Medicaid Title of the

federal Social Security Act; and Title VI of the 1964 Civil Rights Act.

3. This suit challenges Defendants' pattern and practice of failing to fulfill the federal constitutional and statutory obligations they owe to the children in Florida foster care as well as the children's need for a safe, stable and appropriate placement. This suit also challenges Defendants' deliberate indifference to the existence of such pattern and practice; to the children's need for safe, stable and appropriate placements; to the children's health and well being; and to the harm Defendants thereby cause these exceptionally vulnerable children. Plaintiffs, on behalf of themselves and all other similarly situated children, seek injunctive and declaratory relief from such unconstitutional and otherwise illegal practices.

## B. JURISDICTION

4. Because this is an action in which the matter in controversy arises under the Constitution and the laws of the United States, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(3).

## C. PLAINTIFFS

### 1. Bonnie

5. Plaintiff Bonnie L. has been involved with Florida's foster care system since 1986, when she was two years of age. Her father's parental rights were terminated in 1987; her

mother was having trouble making ends meet as a recently divorced single parent with few job skills.  Instead of providing services to the child's mother, DCAF convinced the mother to surrender the Plaintiff and her older sister J.L. so they could be adopted and have a 'better life."  [Plaintiffs' sister J.L. has reached her majority and has left Defendants' custody].

6. Bonnie's adoptive parents, who also cared for her sister and whom DCAF handpicked to care for these children, were abusive beyond imagination.  The girls were subjected to innumerable beatings and other torture, including being tied to the bed by their wrists and ankles, being made to sleep on concrete surrounded by a brick cage at night, and punished if the two girls spoke to each other or anyone else.  DCAF's 'Hotline" received several calls reporting the abuses, including calls in 1990, 1993, 1994 and 1997, before Defendants finally took the girls back into foster care in March 1997 after a total of ten years of what DCAF itself called egregious abuse.  Since then, DCAF chose not even to attempt to seek a permanent family for the girls, moving them from one unsuitable placement to another.

7. In 1999, a guardian ad litem located the girls' natural mother who asked to adopt her biological daughters, Bonnie and her sister. Although DCAF had no other options (and was not even looking for an adoptive placement for the girls),

DCAF initially objected to either of the girls even having contact with their biological mother.

8. For more than three years, Defendants effectively had given up on achieving permanency for these girls and expected them to remain in foster care until they reached their majority.  Recently, Defendants finally acquiesced to the biological mother's adoption of Bonnie, but the adoption is not final. Until it is final, this child remains in foster care.

9. Plaintiff Bonnie L. has suffered and continues to suffer irreparable harm as a result of Defendants' failure to protect her from harm and to provide her expeditiously with a permanent, legally stable family. Both the adoption and the child's placement with her biological mother could easily disrupt, which would require Defendants to select another placement for Bonnie. Defendants' continuing custody of and control over Bonnie, together with their pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, create a real and substantial threat that this child will be subjected to further harm in addition to that which Defendants have already inflicted on her. Plaintiff Bonnie L. brings this action through her next friend Donald Hadsock.

2. <u>Rebecca and Reggie B</u>.

10. Plaintiffs Reggie B. and Rebecca B. are 13-year-old twins who reside in District 9. They entered Defendants' custody and were placed in a shelter on May 4, 1997 and were adjudicated dependent on June 1, 1998. Suitable relative caretakers in other states were not contacted until very recently.

11. Reggie and Rebecca were separated for a while in foster care. For one month, Reggie was sent to a group home to develop "social skills." His therapist, teachers, former foster mother and DCAF caseworker all agree that something major happened at the group home that caused the child to deteriorate drastically. He was returned to his previous overcrowded foster home but continued to deteriorate emotionally, eventually killing a puppy. After he was asked to leave this foster home, he spent weeks moving from one shelter to another, from one foster home to another, usually a different place each night. He left one home and hitchhiked back to the DCAF offices after dark. He has developed such significant emotional problems while in care that he is now in a therapeutic group home.

12. Defendants have only recently approached an aunt of Reggie and Rebecca, who lives out of state, to be a placement resource for them. Although, on information and belief, she helped rear the children while their mother was alive and

before they entered Defendants' custody, no prior request was made for her to care for these children. A home study of this aunt is now under way pursuant to the interstate compact for child placement, but only for Rebecca.  If Defendants had previously identified this relative and placed Reggie and Rebecca with her, Reggie would have been spared the devastating harm he suffered in the group home. This, in turn, would have eliminated even the possibility that he would suffer the debilitating number of replacements he has endured or that he would be subjected to the night-to-night circuit. It would also have expedited the placement of Rebecca - and made it possible for Reggie to be placed - with a permanent family.

13.  Following his experience in Defendants' custody, Reggie now has such severe emotional problems that the aunt is unable to care for him. The twins are currently separated and are likely to remain so. This separation would not have been necessary had the children been provided adequate and safe care from the outset of their placement with Defendants.

14.  Reggie also has a cleft palate and other medical needs which Defendants have failed to address. The Children's Medical Services reports several missed appointments, which have caused him to "fall through the cracks" at the clinic.

15.  Reggie and Rebecca continue to be in Defendants' custody. Thus, Defendants continue to control where the twins

are placed or if they are to be moved. The planned relative placement for Rebecca could easily disrupt prior to or possibly even after the child is moved, and Reggie's current placement in a therapeutic setting could end at any time. Either circumstance would require Defendants to place the children in a new foster home or facility.

16.  Reggie and Rebecca have suffered and continue to suffer serious and irreparable harm as a result of Defendants' failure to protect them from harm, to ensure that Reggie has the medical care he needs, to provide a stable living environment that is adequate to both children's needs, and to achieve permanency expeditiously for these children, which could have been accomplished by Defendants' earlier identification of the aunt as a placement resource. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Reggie and Rebecca will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on them as long as they remain in Defendants' custody. They bring this action through their next friend Danielle Roussel.

### 3. Laurie and Lillie S.

17.  Plaintiffs Laurie S. and Lillie S. are two Black foster children who are sisters and are in the Defendants' custody in Palm Beach County. Born in 1991 and 1993

8

respectively, the girls entered Defendants' custody on December 19, 1994 and remain in foster care today.

18. Laurie and Lillie have several siblings in foster care with whom they were not placed, and they were not provided with sibling visitation. It was not necessary for Defendants to separate Laurie and Lillie from their siblings, or to deny them sibling visitation, in order to protect the health, safety or welfare of any of the children, and a professional competent to make such a judgment has never determined that placement together or regular and frequent visitation would be detrimental to any of them. Instead, these siblings were separated from each other because Defendants failed to recruit a sufficient number of foster homes for large siblings groups, and failed to arrange for visits between the separately placed children. This racially neutral method of administration has a disparate impact on Black siblings in foster care, making sibling separation more likely for Black foster children than for White foster children; has had the effect of discriminating against Laurie and Lillie and other Black foster children on the basis of their race or color; and has had the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' provision of foster care to Laurie, Lillie, and other Black children in Defendants' custody.

19. The parental rights of the children's mother were terminated in March of 1997. The father's rights were not terminated until May 1999.

20. DCAF did not perform a proper, diligent search to locate suitable caretakers for Laurie and Lillie. Instead, DCAF placed the girls in an inappropriate foster home that has been the subject of numerous investigations and is known for housing teenage girls who engage in casual and frequent sexual conduct. DCAF ignored complaints about the placement and kept Laurie and Lillie there for years.

21. The foster mother initially wished to adopt Laurie and Lillie, and, despite the problems with the foster home, the children bonded to her and called her "grandma".  However, Lillie began acting out sexually at school when she was six years old. When the DCAF adoption worker requested that the foster mother work on issues involving her home and parenting, the foster mother requested and obtained the immediate removal of the children.

22. The sudden move from the home where they had lived for the previous five years was traumatic for Laurie and Lillie. Their mental and emotional health began to deteriorate severely, and Lillie, at only seven years of age, expressed the wish to die. She was involuntarily committed to a mental health crisis unit.

23. DCAF has now located an uncle of Laurie and Lillie, who lives out of state and wishes to adopt the girls. This same uncle informed Defendants he was willing to adopt the girls when they were initially removed in 1994, but was told by DCAF that relatives could not adopt.  Placement with this uncle in 1994 would have significantly increased Laurie's and Lillie's opportunity for permanency and concomitantly decreased the chance they would have been exposed either to a damaging environment such as that provided by their pre-adoptive home or the trauma of being uprooted.

24. Defendants' failure to achieve a permanent family for Laurie and Lillie more expeditiously resulted from Defendants' practice of treating Black and White foster children differently based on their race or color and is also due to Defendants' practice of making even less effort to provide services and develop and obtain appropriate foster and adoptive placements for Black foster children than for White children in Defendants' custody.

25. Defendants' failure to develop and maintain a sufficient number of appropriate and safe foster homes and to timely identify relatives who are able and willing to care for children in foster care decreases the children's chance to have a permanent, loving home. These racially neutral practices have a disparate impact on Black foster children, have had the effect of discriminating against Laurie, Lillie

11

and other Black foster children on the basis of their race or color, and have had the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' provision of foster care for these children.

26. Laurie and Lillie have been and continue to be irreparably and seriously traumatized and harmed by Defendants' inappropriate handling of their case, their failure to protect these children from harm, and the several years' delay in being moved to a good permanent family. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional, racially discriminatory and otherwise illegal manner, Laurie and Lillie will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on them as long as they remain in Defendants' custody. Laurie S. and Lillie S. bring this action through their next friend Danielle Roussel.

4. Leslie F.

27. Plaintiff Leslie F. is in Defendants' custody as a foster child. She is currently 17 years of age. Leslie is Black and of Haitian descent. She was freed for adoption when she was nine years old, but has never been adopted or otherwise provided with a permanent home. Leslie's former foster mother adopted Leslie's biological brother, but refused

to adopt Leslie. She then cut off all contact between Leslie and her biological brother.

28. Leslie has endured over 30 different foster care placements, and possibly as many as 50 placements. The child was told by her DCAF foster care caseworker that DCAF could not find a stable placement for her because no one wants her.

29. The grossly inappropriate number of placements to which Defendants subjected Leslie and their failure to provide her with the services she needed to achieve permanency, including but not limited to placing her in an adoptive home that would accept her and providing supportive services to her and her adoptive family, resulted from Defendants' practice of treating Black and White foster children differently based on their race or color. The remarkable instability of Leslie's placements and the failure to achieve permanency for her are also due to Defendants' practice of making even less effort to provide services and develop and obtain appropriate foster and adoptive placements for Black foster children than for White children in Defendants' custody. The system's discrimination against Black children is long-standing; the Defendants are aware of a 1978 Dade County grand jury report condemning the discrimination and demanding an end to it.

30. Defendants' failure to develop and maintain a sufficient number of appropriate foster and adoptive placements increases the likelihood children will be placed

with foster parents incapable of caring for them, which, in turn, leads to disruption and multiple placements. The lack of placements also decreases the chance children will achieve permanency expeditiously. These racially neutral methods of administration have a disparate impact on Black children, have had the effect of discriminating against Leslie and other Black foster children on the basis of their race or color, and have had the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' provision of foster care to Leslie and other similarly situated children.

31. From late 1998 through early 1999, Leslie was in a shelter, even though there was nothing temporary about Defendants' custody of her and she was entitled to a stable placement where she would not suffer further damage or injury.

32. Eventually in 1999, DCAF finally found a foster home for Leslie, but when the DCAF foster care supervisor visited the home after Leslie complained about the conditions there, the supervisor reported the home for investigation because there was insufficient food for the children placed in the foster home, as well as other exhibited problems. These concerns were raised with a DCAF licensing supervisor who is responsible for determining whether foster homes will be licensed and retain their license to care for children in Defendants' custody. This DCAF supervisor was asked to talk to

14

other children in the home to verify the conditions there, but she refused to do so, stating she talks to the foster parents, not to the children. This DCAF supervisor also refused to call the child abuse "Hotline" to report the concerns about the children not being fed in the foster home which, if true, would constitute neglect. Her response was that she is an advocate for foster parents and does not call the Hotline to report them.

33. Since leaving the neglectful foster home in 1999, Leslie has endured several additional moves to other foster care placements. She and other foster children were removed from her most recent foster home in connection with allegations they were in grave danger in the home, and Leslie was placed in a shelter, a totally inappropriate placement for her. She was then placed in yet another temporary placement, from which she ran, but she intends to return to Defendants' physical custody, and remain in their legal custody.

34. As a result of her many moves, Leslie's education has been seriously disrupted. Although DCAF has not made reasonable efforts to find placements that would allow Leslie to continue to attend the same school, she herself has made Herculean efforts to maintain continuity in her education, often having to travel unacceptably long distances to remain in the same school after Defendants transferred to her a new foster care placement.

35. Leslie has sought an opportunity to participate in the subsidized Independent Living foster care program, a benefit provided by the State. There is no application process for this program, and Defendants do not provide children who are excluded from it with notice of the decision or an opportunity to have DCAF's decision reviewed, and their decisions concerning which children will participate in the program are arbitrary and capricious. Thus far, Leslie has not been included in the subsidized Independent Living program.

36. Leslie will turn 18 years of age in October 2000. She has mental health problems and will not be prepared to leave Defendants' custody when she reaches her majority. Individuals in foster care are permitted to remain in care past their 18th birthday if they meet specified criteria, but Defendants do not provide youngsters in their custody who reach their 18th birthday with notice that they have this option or provide such individuals who are discharged from care with an opportunity to have the discharge decision reviewed before or after discharge. Defendants' decisions concerning which individuals will be permitted to remain in care after reaching 18 years of age are arbitrary and capricious. If Leslie is discharged from Defendants' custody when she reaches 18 years of age, she will be exposed to immediate and grave danger because she is not prepared to care for herself.

16

37. Until the Florida Dependency Court took the unusual step of appointing an attorney for Leslie, [something which does not occur for most children in dependency proceedings], Defendants had consistently deprived her of an opportunity to attend and participate in judicial and administrative reviews that addressed her legal, custodial and permanency status. Defendants have failed to notify Leslie of the judicial and administrative reviews, although they routinely provide notice to other parties concerning these types of proceedings, the court had not determined her attendance at judicial review hearings was not in her best interests, and Defendants had not determined she had insufficient maturity to attend administrative reviews of her case. Defendants have also failed to provide the services, such as transportation, that Leslie needed in order to be able to attend and participate in these proceedings, and she had no other source from which to obtain these services. Additionally, Defendants have arbitrarily and capriciously prevented Leslie from participating in DCAF's process for developing a case plan for her, although it would have been appropriate for her to participate in this process. Leslie's case plan addresses, among other things, the appropriateness of retaining her in Defendants' custody, her current placement, the services provided to her, her participation in an Independent Living

Program, and other issues that are critical to her well being and development.

38. Leslie has suffered and continues to suffer irreparable and very serious injury as a result of Defendant's failure to protect her from harm, to provide her with a stable foster care placement, to provide her with permanency, to prevent her separation from her brother, to provide her with an opportunity to participate in all court hearings administrative reviews and the development of case plans that affect her, and to desist from their racially discriminatory practices. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional, racially discriminatory and otherwise illegal manner, Leslie will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she remains in Defendants' custody. Leslie is also at imminent and very real risk of being denied participation in the subsidized Independent Living Program and discharged from Defendants' custody, without notice or an opportunity for a hearing to contest either decision. Leslie F. brings this action through her next friend Brenda Shapiro.

### 5. Sandra M.

39. District 9 Plaintiff Sandra M. is a 16-year-old who was sexually abused and neglected while living at home and,

after six reports of suspected maltreatment, was removed from her mother and placed in foster care in 1989. Sandra and her brother were placed in one foster home for two years, where they bonded to their good, loving foster parents. When the natural parents' rights were terminated and the children became available for adoption, Defendants, for no legitimate reason, denied the children's foster parents' request to adopt the children.

40. DCAF instead separated Sandra from her brother, and both children continued to be held in foster care limbo. Sandra was placed in several different foster homes over the next two years, while she was separated from her brother. She was eventually placed with a foster parent (foster parent "A") who offered Sandra stability.

41. Against the advice of Sandra's guardian ad litem, Defendants then moved Sandra from A's foster home to an adoptive home with her brother and an older sister. By this time, Sandra and her siblings were displaying such disturbed behavior that this adoptive placement lasted only six months, and Sandra was moved back to foster parent A, being separated from her siblings for the last time. At this time Sandra was eight years old and foster parent A decided to adopt her. There were obvious problems with this mother's parenting skills, which were well known to DCAF, and Sandra did not appear to be happy during her foster placement in the home,

which boded ill for a successful adoption. DCAF pursued this adoption, which was finalized, but subsequently failed.

42. The adoptive mother could not handle Sandra, who continued to exhibit disturbed behavior. The adoptive mother placed her at the Nelle Smith Group Home, and on July 2, 1997, Defendants retook custody of Sandra. In the same month, the Nelle Smith Group Home closed, and Defendants placed Sandra at the White Foundation shelter, where she was attacked and beaten by two female residents on July 15, 1997. Due to Defendants' failure to care for her and to provide her with a safe placement, Sandra returned to her adoptive mother. But her adoptive mother was still unable to maintain Sandra due to the child's behavior, and she placed her back in foster care as of October 8, 1997.

43. After Sandra returned to foster care in Fall 1997, Defendants placed her in several foster homes until 1998, when she was placed at the South County Mental Health Center's Group Home, where she did well. But that facility, like the Nelle Smith Group Home, closed, and, because Defendants said they had nowhere else to place her, they placed Sandra at the crisis unit at South County Mental Health Center in April 1998. She remained there for one year, rather than the short (normally 72-hour) period for which placement there is designed. Finally, in May 1999, she was placed at the Adolescent Residential Learning Center at the 45th Street

Mental Health Center, a residential psychiatric setting. She was then "stepped down" to daniel memorial therapeutic group home in December 1999, where she remains.

44. Defendants have never moved to terminate the parental rights of Sandra's adoptive parent; Sandra remains in Defendants' custody as a foster child; and Defendants' intention is for her to remain in foster care until she reaches her majority. Effectively, Defendants have abandoned any attempt to find a permanent home for Sandra.

45. Sandra has been and continues to be seriously and irreparably harmed by Defendants' failure to provide her with a safe and stable foster care placement or an appropriate and stable permanent family. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Sandra will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she remains in Defendants' custody. She brings this action through her guardian ad litem Danielle Roussel.

### 6. Tanya M.

46. Plaintiff Tanya M. is a 14-year-old foster child who was first placed in foster care on August 31, 1998. District 9 DCAF has placed her in several different unsuitable placements including foster homes where she has been neglected

and subjected to cruel and dangerous treatment. In one home, she was not adequately fed and lost a significant amount of weight within one month. Tanya was thin to start with, and this weight loss was unnecessary and harmful. Her complaints to her DCAF worker about this foster home were ignored. In her next foster home, she was one of eight children. All eight children slept in one bedroom and shared one dresser.

47. Tanya's need to be placed in an appropriate foster home was ignored, and DCAF left her at another overcrowded home where she had previously been placed, even though the foster mother had already warned DCAF the child was not acceptable for placement there. Despite this warning, the DCAF worker left Tanya at this foster home after the DCAF office had closed. The foster mother made it clear she did not want Tanya there, and as a result, Tanya left the foster home, although she had no place to go.  Later that night, a Pahokee Police Department officer who was concerned that it was unsafe for her to be walking alone in the area after dark picked up Tanya. At the time, she was carrying all of her possessions in bags and a backpack.

48. Subsequently, an appropriate home was located and Tanya began to thrive in her new environment; she began to do well in school, also. She was subsequently returned to her biological parents on October 18, 1999, after more than 12 months in the foster care system.

49. The reunification with her parents failed. After less than two months, on December 5, 1999, Tanya was assaulted by her father and sustained a broken arm. Tanya was placed in a DCAF shelter and then returned to foster care on May 1, 2000.

50. Both times Tanya was removed from her biological family's home (in 1998 and 2000), her three younger siblings were removed simultaneously. Tanya, however, has never been placed with her siblings, although placement together would not be contrary to the health, safety or welfare of any of the children. No professional qualified by the training, credentials and experience needed to make a sibling-separation decision has ever found that a joint placement would be detrimental to any of the children.

51. Tanya was placed in an overcrowded girls' group shelter. DCAF has stated that it wants to place Tanya at a wilderness camp, which is primarily used as a moderate risk delinquency commitment program, even though Tanya is not a delinquent and has not committed any violations of the law. Tanya remains in Defendants' legal custody as a foster child. As a result of Defendants' failure to provide minimally adequate care and supervision of Tanya, she has run away from the shelter, and her whereabouts are not known, subjecting her to grave danger.

52. Tanya has suffered and continues to suffer irreparable and very serious injury as a result of Defendants' failure to protect her from harm and provide her with a secure, safe and appropriate placement. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Tanya will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she remains in Defendants' custody. She brings this action through Danielle Roussel.

### 7. Jay and Candice D.

53. Plaintiffs Jay D. and Candice D. are brother and sister, born on August 28, 1992 and May 6, 1991, respectively. They were placed in foster care on February 15, 1996, and have lived continuously in foster care since that date. They remain in Defendants' custody. Parental rights were terminated with respect to these children on June 17, 1998.

54. Jay and Candice have resided in a stable home-like environment at the Real Life Children's Ranch since April 30, 1997. Candice has lived with the same group-home parents for her entire placement at the Real Life Ranch, and Jay has lived with his same group-home parents since September 1998. The children are bonded to their house parents, attend community schools, and are part of their group-home families; both

24

families want to adopt the D. children who currently resides with them and have placed adoption bids for the children.

55. For some time Jay's and Candice's older brother was also placed at the Real Life Ranch. The younger children had been separated from him earlier because of his aggressive behavior, and he was subsequently discharged from the Real Life Ranch on July 22, 1999, because of allegations of inappropriate sexual behavior toward his siblings. The elder brother was subsequently rejected by a prospective foster home based on the perceived danger he posed to the family's biological son, and he was eventually placed in a facility with his own alarmed room. This placement also failed because of his aggression toward the younger children also in the facility.

56. Jay and Candice, who had exhibited problematic behaviors while their elder sibling was at the Real Life Ranch, have achieved far more stable and acceptable behavior patterns since his removal and they are doing remarkably well in their placement. The children's therapist, as well as the staff at the Real Life Ranch, have indicated their belief that Jay's and Candice's behavior has stabilized because their elder brother was removed from their living environment, which resulted in the children developing an increased sense of security.

57. Between April 1997 and February 2000, Jay and Candice had only three visits from a DCAF caseworker. The decision to deny them caseworker oversight and protection was not subject to a meaningful professional, administrative or judicial review.

58. Despite Defendants' almost complete lack of meaningful contact with Jay and Candice for almost three years, on March 20, 2000, Defendants announced their intention to remove Jay and Candice from the Real Life Ranch almost immediately, place them in an interim foster placement and then replace them in yet another foster home to which their elder brother would also be moved. This plan is currently on hold, but since Defendants announced their intention to remove Jay and Candice from the Real Life Ranch, they have excluded the personnel of the Real Life Ranch from any case planning, staffings or meetings concerning Jay and Candice. Defendants cannot make competent professional judgments about how these children are functioning, what their needs are, and what plans are appropriate for them in the absence of information from the responsible adults who care for and observe Jay and Candice on a daily basis.

59. As long as Jay and Candice remain in foster care, they are at substantial and very real risk that Defendants will return to their long-standing policy and practice of

denying these children the protection of monthly caseworker visits, to which they are entitled.

60. Jay and Candice are at imminent risk of further serious and irreparable injury because Defendants fail to exercise competent professional judgment in making decisions concerning these children's care and safety and intentionally exclude critically important and readily available information from that decision-making process. Plaintiffs Jay D. and Candice D. appear by their next friend Lori A. Haythorn.

8. Matthew I.

61. Plaintiff foster child Matthew I. is two years old. He entered foster care in October 1999. Matthew was neglected in a grossly overcrowded foster home in Palm Beach County that housed a total of seven children, including a child with Down's Syndrome, whose special needs placed a further drain on the foster parents. Defendants were fully aware of the number of children in this home when they placed and retained Matthew and the other foster children there.

62. On October 15, 1999, a worker from an agency that contracts with Defendants observed Matthew to be very sick, to have difficulty breathing, and to have a bite mark on his arm. The foster mother reported that another two-year-old in the foster home had bitten Matthew.

63. On November 6, 1999, a worker from the same contract-agency observed Matthew to be very dirty, with dirty

ears, dirty hair, scaly skin on his scalp, a bruise on his chin, a dirty diaper with red sores and scabs on his buttocks and inner thighs, and long, dirty finger and toe nails. Matthew was again very sick and wheezing. The foster home was observed as emitting a strong, offensive odor; the sink was overflowing with dirty dishes; old food was on the floor; and weeks' worth of dirt was encrusted on the floor. The contract-agency worker took Matthew to a hospital emergency room. He had a fever of 104 degrees and was diagnosed with bacterial pneumonia; he was treated and released. The foster home was reported to Defendants' child abuse "Hotline".

64. On November 19, 1999, a DCAF worker observed Matthew to be very sick, dirty and with a black eye. The foster mother reported that Matthew and another child fell off the couch while fighting. The DCAF worker did not report the condition of the foster home or of Matthew to the "Hotline". Despite repeated observations that this was an unfit foster home, Defendants did not remove Matthew from this home until January 17, 2000. Matthew's new foster mother observed him to be very sick and to have difficulty breathing when she received him. A nebulizer machine was provided to the new foster home for Matthew's use, but the new foster mother did not know, and was not instructed, how to use it. After five days in this new foster home, Matthew was observed as looking better than he ever had. Instead of being left there, he was

returned to the previous foster home on January 24, 2000.  On at least three subsequent occasions, Matthew was observed as extremely dirty, and he was consistently sick at his day care center. Matthew was finally removed from this inadequate and, for him, dangerous home on February 9, 2000.

65.  Matthew has suffered and continues to suffer serious and irreparable harm as a result of Defendants' failure to ensure he has the medical care and living environment that meet his needs and do not subject him to harm. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Matthew will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on him as long as he remains in Defendants' custody. Matthew I. brings this action through Danielle Roussel.

### 9. Hugh S.

66.  Plaintiff Hugh S. is a 16-year-old Palm Beach County foster child. In 1996, when he was twelve years old, his mother died and his father turned him in to DCAF, claiming he was not the child's biological father. The parental rights of the father were never terminated, and DCAF has neither located Hugh's natural father nor made an attempt to locate a good, permanent substitute family for this child.

67. Hugh has been moved from place to place because of a lack of placements for teenagers, and he has missed a significant amount of school, having spent many days in DCAF's office rather than in school. He has spent weeks not knowing where he would be spending the night from one night to the next. He would wait in the DCAF office during the day and then be taken to a place in the evening where he could only spend one night. Night-to-night placements are not uncommon for children in Defendants' custody; the DCAF pattern and practice of not timely moving children to permanency contribute to overcrowding in foster placements and a lack of sufficient, safe, suitable foster placements.

68. Hugh has had inadequate clothing, and often had no jacket; his foster home did not have the funds to purchase a jacket for him. This situation prompted complaints to DCAF from his school that he would come to school with inadequate and dirty clothes.

69. During the summer of 2000, Hugh resided with his father (who originally placed him into foster care), but remained in Defendants' custody as a foster child. His father then returned Hugh to Defendants' physical custody, and he was again on the night-to-night circuit. During July 2000, he resided at a runaway shelter, although he is not a runaway, and had only one change of clothing. The shelter insisted Hugh attend summer school because all of the youngsters at the

shelter did so, although he had inadequate clothing and had not previously been in summer school. Even if Hugh eventually returns to his father, this arrangement could easily disrupt, as it has in the past, and Hugh could remain in or return to foster care.

70.  Hugh has been and continues to be seriously and irreparably harmed by Defendants' failure to provide him with a stable, appropriate placement, to achieve permanency for him, and to provide for his basic needs. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Hugh will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on him as long as he remains in Defendants' custody. He brings this action through his next friend Danielle Roussel.

### 10. Leanne and Tammy G.

71.  Plaintiff foster child Leanne G. is a two-and-one-half-year-old Black girl who was taken into Defendants' custody and placed in a shelter at birth and entered formal foster care (after dependency adjudication) as a young infant on March 11, 1999. Leanne was then placed in a neglectful and inadequate foster home, where she failed to thrive. By age 13 months, Leanne was still not on solid food and was kept in her crib or playpen the majority of the time.

72.  Leanne's foster mother refused to take the child to the pediatrician between March 17, 1999 and September 10, 1999. When the DCAF worker finally took Leanne to the pediatrician, the pediatrician could not effectively treat the child because the DCAF worker provided no information about the child and the foster mother refused to attend appointments. The pediatrician, who threatened not to treat Leanne any further unless he was provided with necessary information, also noted that the "baby's muscles [were] very tight… but does [sic] not bear weight" and that the "baby [was] not receiving therapies."

73.  Leanne has five siblings in foster care, including Plaintiff Tammy G. Leanne did not see her siblings for one year. There is no legitimate reason for Leanne's and Tammy's separation from their siblings or the denial of sibling visitation. The decision to separate these children and deny them visitation with each other was not reviewed by a professional qualified by training, experience and credentials to determine whether separating the children was necessary to protect their health, safety and welfare.

74.  Defendants have separated these children only because they do not have a sufficient number of foster homes that will care for large family groups. The effects of separating siblings in their placements are compounded by the Defendants' unjustified failure to arrange for visitations

32

between siblings at least once monthly, as required by law. Defendants' racially neutral failure to recruit a sufficient number of foster families suitable for sibling groups and their failure to provide at least monthly visitations between siblings has a disparate impact on Black siblings in foster care, making sibling separation more likely for Black foster children than for White foster children; has had the effect of discriminating against Tammy, Leanne and other Black foster children on the basis of their race or color, and has had the effect of defeating or substantially impairing the accomplishment of the objectives of defendants' provision of foster care to Tammy, Leanne and other Black children in Defendants' custody.

75.  Although Leanne has been placed in a pre-adoptive home, DCAF has effectively put the adoption on hold and the prospective adoption and the placement could easily disrupt at any time. Defendants do not have an alternative strategy for achieving permanency for Leanne.

76.  Defendants' failure to achieve permanency for Leanne has resulted from Defendants' practice of making even less effort to provide services and develop and obtain appropriate adoptive placements for Black foster children than for White children in Defendants' custody.

77.  Defendants' failure to develop and maintain a sufficient number of adoptive homes decrease the likelihood

children will achieve permanency expeditiously. This racially neutral method of administration has a disparate impact on Black children, has had the effect of discriminating against Leanne and other Black foster children who are appropriate for adoption on the basis of their race or color, and has had the effect of defeating or substantially impairing the accomplishment for Leanne and similarly situated Black foster children of the objectives of Defendants' foster care and adoption program.

78.   Leanne has been and continues to be irreparably and seriously injured by Defendants' failure to protect her from harm, to meet her basic needs, to achieve permanency for her, and to place her with her siblings or, if that would be harmful to one of the children, as determined by professional competent to make such a determination, to provide her with regular and frequent sibling visitation.  (Such a professional might, but would not necessarily, find that a delay in achieving permanency for one of the children would pose an unacceptable risk of harm to the child, justifying separation).  As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional, racially discriminatory and otherwise illegal manner, Leanne will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she

remains in Defendants' custody. She brings this action through her next friend Danielle Roussel.

79. Plaintiff Tammy G. is a nine-year-old Black foster child from District 9 who was placed in foster care on October 21, 1997, at the same time as four of her siblings. She has seen her siblings only once during the past year. Her younger sister, Plaintiff Leanne, came into care in 1999, and the six siblings are in six different homes.

80. Tammy has been in four separate homes in the past three years. In one home, the foster parent punished Tammy by forcing her to stand with one leg in the air, for considerable periods of time. In another placement, the foster mother abusively punished her by twisting her arm behind her back and by twisting her nose. The abuse was not adequately investigated by DCAF, consistent with its pattern and practice of greater toleration of child abuse committed by DCAF agents and contract providers than that allegedly committed by parents.

81. In her current DCAF-selected placement, Tammy sleeps with three other children in a room attached to a converted garage. This room has central air conditioning, but the air conditioning is not used. Tammy is not being fed properly in this foster home.

82. Defendants' failure to provide Tammy with the services she needed to achieve permanency, including but not

limited to taking the reasonable, necessary steps to seek and secure an appropriate adoptive home for her, resulted from Defendants' practice of treating Black and White foster children differently based on their race or color. Defendants' failure to achieve permanency for Tammy is also due to Defendants' practice of making even less effort to provide services and develop and obtain appropriate adoptive placements for Black foster children than for White children in Defendants' custody.

83. Defendants' failure to develop and maintain a sufficient number of adoptive homes decrease the likelihood children will achieve permanency expeditiously. This racially neutral practice has a disparate impact on Black children, has had the effect of discriminating against Tammy and other Black foster children appropriate for adoption on the basis of their race or color; and has had the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' foster care and adoption program for Tammy and other similarly situated Black foster children.

84. Tammy has been and continues to be irreparably and very seriously injured as a result of Defendants' failure to protect her from harm and to provide her with both a stable placement and permanency, as well as by Defendants' separation of Tammy from her siblings and denial of regular and frequent visitation. As a result of Defendants' pattern and practice of

operating the Florida foster care system in an unconstitutional, racially discriminatory and otherwise illegal manner, Tammy will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she remains in Defendants' custody. She brings this action through her next friend Danielle Roussel.

### 11. Elaine R.

85.   Plaintiff Elaine R. is an eleven-year-old Dade County child who was taken into Defendants' custody in 1993 and has languished in foster care since then. Separated for no reason from her siblings, who are also in foster care, she finally had parental rights terminated in or before August 1997 and was then placed for adoption with a licensed foster family. At the time of this placement, the father of this foster family already had a criminal record for sexually abusing children. Elaine lived nearly twelve months in that pre-adoptive home, subjected to multiple sexual assaults and abuse before she was removed from this foster home and criminal charges were instituted against the foster father.

86.   A suitable adoptive parent has now been found for Elaine, but Defendants are delaying this adoption, thereby denying Elaine the opportunity to have a real, permanent family. Defendants have no alternative strategy by which Elaine will achieve permanency.

87.  Elaine has suffered and continues to suffer serious and irreparable injury as a result of Defendants' failure to protect her from harm, to protect her interest in living and maintaining contact with her siblings, and to provide her with a permanent, legally stable family. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Elaine will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she remains in Defendants' custody. She brings this action through her guardian ad litem Kristi Kassebaum.

### 12. Paul B.

88.  Plaintiff Paul B. is a 16-year-old Black foster child from Palm Beach County. While living with his biological family, he was placed under DCAF supervision in April 1983 at the age of two weeks and remained under DCAF supervision until he entered foster care in September of 1993, at the age of ten years. Paul has had at least 33 placements, including a period at a DCAF shelter (although he had already been adjudicated dependent), where he was placed due to a claimed lack of foster homes. This shelter facility was used to house juvenile delinquents, some of whom were violent offenders.

89.  Paul's multiple moves, as well as his having to attend school at such shelter facilities, have caused him to

fall behind in his education. The Palm Beach County Board of Education has no record that Paul attended school during an entire academic year Paul spent in a DCAF facility.

90.   Paul has, moreover, been denied a good permanent family. Paul's parents' rights were terminated, but he was never placed for adoption.

91.   The outrageous number of times Defendants moved Paul and their failure to provide him with the services he needed to achieve permanency, including but not limited to the placement of Paul in an adoptive home, resulted from Defendants' practice of treating Black and White foster children differently based on their race or color. The shocking instability of Paul's placements and the failure to achieve permanency for him are also due to Defendants' practice of making even less effort to provide services to and develop and obtain appropriate foster and permanent placements for Black foster children than for White children in Defendants' custody.

92.   Defendants' failure to develop and maintain a sufficient number of appropriate foster and adoptive placements increases the likelihood children will be placed with foster parents incapable of caring for them, which, in turn, leads to disrupted and multiple placements. The lack of placements also decreases the chance children will achieve permanency expeditiously. This racially neutral method of

administration (the failure to maintain a sufficient number of foster placements) has had a disparate impact on Black foster children, has had the effect of discriminating against Paul and other Black foster children on the basis of their race or color, and has had the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' placement of Paul and other similarly situated Black children, out of their own home and into foster care.

93. Paul has and continues to suffer serious and irreparable harm as a result of Defendants' failure to provide him with a safe, stable and secure placement, to ensure he received an adequate education, and to provide him with a permanent, legally stable family. Paul's injuries also resulted from Defendants' racial discrimination. Paul is currently in Defendants' legal custody. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional, racially discriminatory and otherwise illegal manner, Paul will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on him as long as he remains in Defendants' custody. He brings this action through his next friend Danielle Roussel.

13. Rachel C.

94.   Plaintiff Rachel C. is a 13-year-old Palm Beach
County child kept by DCAF in a temporary shelter for more than
12 months, from approximately October 5, 1998 through
approximately April 3, 2000. At this shelter, Rachel was
housed with girls with significant mental health and
delinquency histories, rendering this facility entirely
inappropriate for her. While Rachel resided there, she was
charged as a delinquent. Rachel left Defendants' care in April
2000 to reside with an uncle, but returned to Defendants'
custody on June 13, 2000. Rachel remains in Defendants'
custody as a foster child, and is in a shelter.

95.   Rachel has suffered and continues to suffer
irreparable and very serious harm as a result of Defendants'
failure to provide her with a safe, stable and secure
placement. As a result of Defendants' pattern and practice of
operating the Florida foster care system in an
unconstitutional and otherwise illegal manner, Rachel will
continue to be at substantial and imminent risk of being
subjected to the types of harm Defendants have already
inflicted on her as long as she remains in Defendants'
custody. Rachel C. brings this action through her next friend
Danielle Roussel.

14. Cathy W.

96.   Plaintiff Cathy W. is a twelve-year-old child who
was held in a temporary shelter in District 9 beginning in May

41

1999, even though the Defendants knew the placement exposed her to significant danger and provided her with inadequate supervision. Cathy was involved in several sexual incidents at the shelter, which were clearly and obviously foreseeable, given the past behavior of the youngsters involved, the inappropriateness and danger created by having these children in the same facility, and the absence of minimally competent supervision of these children.  Cathy remains in Defendants' custody as a foster child.

97.  While in this chaotic and inadequately supervised environment, Cathy was charged as a delinquent.  She remains in Defendants' custody as a foster child and has since been placed in a residential treatment facility. As a result of these incidents and Defendants' failure to provide Cathy with a safe, stable placement, Cathy has been seriously and irreparably harmed and her health has been placed at grave risk. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Cathy will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she remains in Defendants' custody. Cathy W. brings this action through Danielle Roussel.

15. Larissa C.

98.   Plaintiff Larissa C. was two years old in July 2000. While in foster care, she was placed in an abusive and neglectful foster placement in Flagler County where she was subjected to repeated abuse. Defendants failed both to screen this foster home adequately before placing Larissa there and to supervise the foster home while she lived there. The traumatic brain injuries inflicted upon this child by the foster parents DCAF selected and then failed to supervise have left her partially paralyzed with impaired vision and speech. Larissa remains in Defendants' custody as a foster child.

99.   Larissa has been and continues to be irreparably and very seriously injured as a result of Defendants' failure to protect her from harm. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, Larissa will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on her as long as she remains in Defendants' custody. She brings this action through her attorney ad litem and next friend Rhoda Goodson.

### 16. John J.

100. Plaintiff John J. (twelve years of age) entered Defendants' custody as a foster child in approximately 1989 and is still in foster care. John has been in multiple different foster placements. Until recently, Defendants failed

to search for a suitable relative placement, although it was discovered years after he entered Defendants' custody that an appropriate aunt was willing to care for John.

101.   During his stay in foster custody, DCAF District 6/Hillsborough County DCAF kept John for more than 12 months at an over-crowded foster home where he was subjected to beatings and horrible, sadistic abuse, including hot sauce applied to his tongue, his face dunked in the toilet bowl and kept there until he gasped for breath, and ridicule, all prohibited by the Defendants' rules. Although DCAF's rules prohibit more than five children in a house, this house was licensed for seven children during the pertinent time. Following DCAF's express rejection, in 1993, of a request to increase the licensed number to ten children, there were in fact ten or more children there during the material times. When the child abuse "Hotline" was called, DCAF ignored the abuses, exonerated the foster parents and kept the home open.

102.   John has suffered and continues to suffer serious and irreparable injury as a result of Defendants' failure to protect him from harm and Defendants' delay in providing him with an opportunity for a permanent, legally stable family. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional and otherwise illegal manner, John will continue to be at substantial and imminent risk of being subjected to the types

of harm Defendants have already inflicted on him as long as he remains in Defendants' custody.   John J. brings this action through his next friend Mary Miller.

### 18. Melinda and Karina

103. Plaintiff Karina (17 years of age) is one of two Dade County DCAF/District 11 sisters held by the State of Florida in foster care since 1986; they were four and two years of age when they entered Defendants' custody. Now 18, Melinda should still be in foster care, participating in the subsized independent living program.  DCAF conferred with her without her guardian ad litem or her attorneys present and coerced and misled her to allegedly sign a form purportedly ending foster care efforts for her.  Defendants have not provided Melinda's guardian ad litem or court-appointed counsel with a copy of the alleged form; Plaintiffs believe any such form to be invalid, under the circumstances existing, and efforts for Melinda to re-access services to which she may be entitled are ongoing.  Plaintiff Karina remains in foster care. Neither was ever placed for adoption, and Defendants never pursued an alternative form of permanency for either child. In fact, despite adoption being recommended several times by some DCAF caseworkers and DCAF retained therapists, these girls were never even available for adoption because Defendants, contrary to law, made absolutely no efforts to terminate the parental rights of their absent father and give

them an opportunity for permanency, even though DCAF knew the lack of a permanent family was seriously harming the girls.

104. During their 14 years in Florida's foster care system, Melinda and Karina have been subjected to rapes, beatings and neglect. Melinda contracted syphilis when she was nine years old. The girls have been wrongly separated from each other. Their minds have been damaged by years of psychotropic medications administered for non-therapeutic reasons with Defendants' approval for the convenience of their caretakers. They have been confined for years needlessly in restricted, locked facilities and held there as virtual captives. Melinda and Karina now have permanent mental disabilities.

105. Although of mixed Hispanic descent, Melinda and Karina were labeled and treated as African-American children. The number of placements to which Defendants subjected Melinda and Karina and Defendants' failure to provide them with the services they needed to achieve permanency, including but not limited to the prosecution of a proceeding to terminate parental rights of their father and placement of these girls in an adoptive home, resulted from Defendants' practice of treating Black and White foster children differently based on their race or color. Melinda's and Karina's lack of a stable placement and a permanent family are also due to Defendants' practice of making even less effort to provide services and

develop and obtain appropriate foster and adoptive placements for Black foster children than for White children in Defendants' custody.

106. Defendants' failure to develop and maintain a sufficient number of appropriate foster and adoptive placements increases the likelihood children will be placed with foster parents incapable of caring for them which in turn leads to disrupted and multiple placements. The lack of placements also decreases the chance children will achieve permanency expeditiously. These racially neutral practices have a disparate impact on children of color and have had the effect of discriminating against Melinda and Karina and other similarly situated foster children on the basis of their color or their race or perceived race, and have had the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' provision of foster care for Melinda and Karina and other children of color.

107. Karina, the younger sister, remains in Defendants' custody as a foster child and does not have a permanent family, and is currently absent from her placement without permission. Defendants have done little or nothing to recover Karina, although, while absent from her placement, she has been seriously injured and continues to be at grave and imminent risk of further harm.

108. Melinda is now 18 years of age, and she is either still in Defendants' legal custody or was misled or coerced by Defendants into leaving their custody. Melinda meets the eligibility criteria for remaining in foster care beyond her 18th birthday, but Defendants have effectively denied her this option without the opportunity for a hearing to determine her eligibility and entitlement to remain in foster care.

109. Until the Florida Dependency Court took the unusual step of appointing an attorney for Melinda, [something which does not occur for most children in dependency proceedings], Defendants had consistently deprived her of an opportunity to attend and participate in judicial and administrative reviews that addressed her legal, custodial and permanency status. Defendants have failed to notify Melinda of the judicial and administrative reviews, although they routinely provide notice to the other parties concerning these types of proceedings, the court had not determined her attendance at judicial review hearings was not in her best interests, and Defendants had not determined she had insufficient maturity to attend administrative reviews of her case. Defendants have also failed to provide the services, such as transportation, that Melinda needed in order to be able to attend and participate in these proceedings, and she had no other source from which to obtain these services. Additionally, Defendants arbitrarily and capriciously prevented Melinda from participating in

DCAF's process for developing a case plan for her, although it would have been appropriate for her to participate in this process. Melinda's case plan addresses, among other things, the appropriateness of retaining her in Defendants' custody, her current placement, the services provided to her, her participation in an Independent Living Program, and other issues that are critical to her well being and development.

110. Melinda and Karina have suffered and continue to suffer irreparable and very serious injury as a result of Defendants' failure to protect them from harm, to provide them with the opportunity to have a permanent, legally stable family, and to provide them with appropriate care. Melinda has further been seriously and irreparably harmed by being deprived of continuing foster care services through Defendants' arbitrary and capricious actions and be being denied an opportunity to participate in all court hearings, administrative reviews and the development of case plans that affect her. As a result of Defendants' pattern and practice of operating the Florida foster care system in an unconstitutional, racially discriminatory and otherwise illegal manner, Melinda and Karina will continue to be at substantial and imminent risk of being subjected to the types of harm Defendants have already inflicted on them as long as they remain in Defendants' custody. The girls are acting through their guardian ad litem Brenda B. Shapiro.

D.   DEFENDANTS

111. Defendant Jeb Bush is the Governor of the State of
Florida, the head of the Executive Branch of government and
the person responsible for the proper operation of the foster
care and adoption systems and for the hiring and continued
employment of Kathleen Kearney, Secretary of DCAF.  Defendant
Bush is sued in his official capacity.  By law, Defendant Bush
is responsible for supervising Defendant Kearney.  He is also
responsible for the proper administration of DCAF, proposing a
proper budget for DCAF to the legislature and assuring that
DCAF operates in conformity with the federal law and State
plans submitted to the federal government, which allow Florida
to qualify for funding under Title IV and Title XIX of the
Social Security Act, including the Adoption and Safe Families
Act and the EPSDT provisions of the Medicaid Title of the
federal Social Security Act.

112. Defendant Bush is responsible for ensuring that DCAF
is operated in accordance with federal law and protects the
federally ensured civil rights of the children in Florida
foster care, to ensure that the system is not operated
recklessly or with deliberate indifference to the needs,
safety, lives and rights of Florida's foster children.
Additionally, since his inauguration in January 1999,
Defendant Bush has directed the operation of Florida's foster
care system and dictated the actions to be taken by the other

Defendants in the operation of Florida's foster care system in a manner that is contrary to law and proper, competent professional standards.

113. Defendant Kathleen Kearney is Secretary of the Department of Children and Families of the State of Florida. She is sued in her official capacity. Under Florida law, Defendant Kearney is responsible for supervising, directing, organizing, planning, administering and executing the functions of DCAF, for ensuring that DCAF performance is in compliance with federal law, for operating the foster care system in such a way as to protect the lives, safety, health and rights of the children in Florida foster care and for ensuring it is operated in such a manner that competent professional judgment is exercised in caring for the children. Additionally, she is responsible for ensuring that DCAF agents and employees exercise proper professional judgment consistent with professional standards in caring for the children subject to their jurisdiction and in their care.  Defendant Kearney is also responsible to ensure that the system is not operated recklessly or with deliberate indifference to the needs, safety, lives and rights of Florida's foster children. In this role, she serves at the pleasure of and subject to the direction of Defendant Bush.

114. Defendants Bates, Awad, Tibbs, Johnson, Richard, Dixon, Morin, Gibbons, Brown, Auslander, Davenport, Howard,

Gray and Martin are the District Administrators of DCAF's Districts One through Nine and Eleven through Fifteen, respectively [collectively referred to as "District Administrators"]. They are sued in their official capacity. Each District Administrator serves at the pleasure and direction of Defendants Kearney and Bush; each serves as the local official in charge in their respective DCAF districts, to ensure that the children in Defendants' custody are free from harm and receive proper care while in state foster care. They also have the legal duty to ensure that the foster care system is operated in accordance with federal law and protects the civil rights of the children in Florida foster care. Each District Administrator is further obligated to ensure that proper professional standards and judgment are exercised in determining and providing for the protection, familial and permanency needs of the children in foster care, and to ensure that the system is not operated recklessly or with deliberate indifference to the needs, safety, lives and rights of Florida's foster children.

115. Defendants are aware of the rampant deficiencies in the operation of the Florida foster care/adoption system and have failed to take the steps needed to cause it to operate in a manner that does not violate the federally protected rights of the children in Defendants' care, but instead is operated in conformity with accepted professional standards.

116.  At all times and in all respects relevant to the claims herein, Defendants Bush, Kearney and the District Administrators were acting in their official capacities and under color of state law.

### E.  CLASS ACTION ALLEGATIONS

#### 1. The System-Wide Class

117. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. The class consists of all children who are currently or who will be in the custody of Defendants as an alleged or adjudicated dependent child.

118. Every child in foster care is directly and adversely affected by the Defendants' deficient operation of Florida's foster care system and specifically by Defendants' acts and decisions that impair the children's federally protected rights as a result of Defendants' failure to comply with accepted professional standards and to exercise competent professional judgment. Children who have the misfortune of being taken into Florida's foster care system routinely have their rights deliberately disregarded by Defendants and are likely to be harmed by the experience.

119. Plaintiffs are members of the class they seek to represent; each Plaintiff and each putative class member is currently in Defendants' custody, with the possible exception

of Melinda who, if she is not in Defendants' custody, was improperly coerced or misled by Defendants into leaving foster care.

120. The class is so numerous that joinder of all class members is impracticable. There are presently approximately 15,000 children in Florida foster care, including foster home care, emergency shelter care and residential group care, and Defendants expect this population to increase to over 18,000 by June 2001. "Expenditures by Issue and Appropriation Category, Detail of Expenditures, Exhibit D-3A" September 10, 1999, at 145-46; hereinafter "Budget Document.")

121. There are questions of law or fact that are common to Plaintiffs and the members of the class they seek to represent, and the claims of the Plaintiffs are typical of the claims of the other class members. Each Plaintiff and each putative class member is in need of safe and adequate foster care, must rely on Defendants for the provision of all care, treatment and services they need, and is harmed by the Defendants' systemic failures to fulfill their legal obligations in the provision of such care, treatment and services.

122. The common questions of fact shared by Plaintiffs and the members of the class they seek to represent include:

    a. Whether Defendants fail to provide children in their custody with safe, stable and secure foster care

placements, as required by law and accepted professional standards;

b. Whether Defendants fail to provide foster children with legally required services, consistent with accepted professional standards, that are necessary to prevent the children from deteriorating while in Defendants' custody, including appropriate medical and educational services; and

c. Whether Defendants fail expeditiously to take reasonable steps to seek and secure for the children in their custody a permanent, legally stable family, as required by federal law and accepted professional standards.

123. Questions of law common to Plaintiffs and their putative class members include:

a. Whether Defendants' actions and inactions violate rights secured to Plaintiffs and the members of the class they seek to represent by the First, Ninth and Fourteenth Amendments to the United States Constitution; and

b. Whether Defendants' actions and inactions violate rights secured to Plaintiffs and the members of the class they seek to represent by the Adoption Assistance and Safe Families Act and the EPSDT provisions of the Social Security Act.

124. The legal claims alleged by the Plaintiffs are typical and representative of those of the members of the putative class. The injuries Plaintiffs have and continue to suffer are typical of the injuries the proposed class members have suffered and continue to suffer. Declaratory and equitable relief addressed to the putative class members' claims and injuries will address equally the claims and injuries of the individual named Plaintiffs.

125. The representative Plaintiffs will fairly and adequately protect the interests of the class. They bring this action through their well-qualified representatives, including guardians ad litem and next friends. They are represented by geographically diverse, competent counsel including board-certified civil trial and appellate lawyers and attorneys with experience in class action litigation and child advocacy.

126. The Defendants have acted and refused to act on grounds generally applicable to all members of the class, making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

127. Although they are the legal custodians of the Plaintiffs and all members of the putative class, Defendants have an inescapable and inherent conflict of interest with these children and cannot bring this action against themselves on behalf of these children.

## 2. The Subclass of Black Foster Children

128. Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. The subclass consists of all children who are Black or are perceived by Defendants as being Black and are or will be in the custody of Defendants as an alleged or dependent child. All putative subclass members are also members of the system-wide class of foster children that all Plaintiffs seek to represent, and the allegations concerning the class as a whole are incorporated here by reference.

129. Every Black child in foster care is directly and adversely affected by the Defendants' racially discriminatory operation of Florida's foster care system.

130. Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina are members of the subclass they seek to represent; each such Plaintiff and each putative class member is in Defendants' custody, with the possible exception of Melinda, who, if she is not in Defendants' custody, was coerced or misled by Defendants into leaving foster care.

131. The subclass is so numerous that joinder of all subclass members is impracticable. There are presently at least 6,000 Black children in Florida foster care, including

foster home care, residential group care and emergency shelter care, and this number is increasing.

132. There are questions of law or fact that are common to Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina, and the members of the subclass they seek to represent, and the claims of these Plaintiffs are typical of the claims of the other subclass members.

133. The common questions of fact shared by Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina and the members of the subclass they seek to represent include:

a. Whether Defendants treat Black foster children differently from White children in Defendants' custody because of their race or color, in the provision of foster care or adoption services to them, such as providing safe, secure, stable foster care placements; prosecuting termination of parental rights proceedings; and placing children in adoptive or other permanent homes; and

b. Whether Defendants utilize racially neutral criteria or methods of administering foster care and adoption services that have a disparate impact on Black foster children or have the effect of defeating or substantially impairing the accomplishment of the

objectives of such foster care and adoption services for Black foster children.

134. Questions of law common to Plaintiffs and their putative subclass members include:

a. Whether Defendants' treatment of Black foster children with respect to the provision of foster care or adoption services constitutes illegal discrimination on the basis of race or color in violation of Tile VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d, et seq. and the regulations promulgated under the Act; and

b. Whether the racially neutral criteria or methods of administering foster care and adoption services used by Defendants have the effect of illegally discriminating against Black foster children on the basis of race or color in violation of Tile VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d, et seq. and the regulations promulgated under the Act.

135. The legal claims asserted by Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina are typical and representative of those of the members of the putative subclass. The injuries these Plaintiffs have and continue to suffer are typical of the injuries the proposed subclass members have suffered and continue to suffer. Declaratory and equitable relief addressed to the putative subclass members' claims and injuries will

address equally the claims and injuries of Plaintiffs Paul B.,
Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G.,
Melinda and Karina.

136. Plaintiffs Paul B., Leslie F., Laurie S. and Lillie
S., Tammy G., Leanne G., Melinda and Karina will fairly and
adequately protect the interests of the subclass. They bring
this action through their well-qualified representatives,
including guardians ad litem and next friends. They are
represented by geographically diverse, competent counsel
including board-certified civil trial and appellate lawyers
and attorneys with experience in class action litigation,
child advocacy and claims of discrimination on the basis of
race or color.

137. The Defendants have acted and refused to act on
grounds generally applicable to all members of the subclass,
making appropriate final injunctive relief and corresponding
declaratory relief with respect to the subclass as a whole.

F. STATEMENT OF FACTS

138. Plaintiffs incorporate paragraphs 1 through 135 into
the Statement of Facts.

1. Violations of Foster Children's
Substantive Due Process Rights

139. Because plaintiffs and the putative class members
are in government custody and wholly dependent on the
government for protection of all aspects of their health and

well-being, Defendants are obligated under the Due Process Clause of the Fourteenth Amendment to the United States Constitution: to meet these children's basic needs for food, clothing, shelter, and medical, educational and other services, either by providing the needed service or ensuring the service is provided; to provide safe care and a placement that protects Plaintiffs and the putative class members from unnecessary harm, injury or deterioration and neither contravenes accepted professional standards of social work practice nor undermines, impairs or adversely affects their well-being, health, development or education;  to provide or ensure the provision of the services these children need to prevent harm, injury or deterioration from occurring; to provide or ensure the provision of the services, help and protection Plaintiffs and the putative class members need to ameliorate any harm, injury or deterioration caused or exacerbated by the actions or inactions of Defendants; to provide care to Plaintiffs and their putative class members that, in terms of their nature, conditions and duration, are consistent with the purposes for which Defendants assumed custody of these children. In each category, the required services and care must be sufficient to provide a safe environment in which Plaintiffs and the putative class members do not deteriorate.

140. Defendants have engaged in a pattern and practice of failing to fulfill these obligations to Plaintiffs and the putative class members in a variety of ways, as described below. In all such manifestations, Defendants have acted to the detriment of Plaintiffs and the putative class members as a consequence of Defendants' failure to exercise competent professional judgment in the decisions they make and the actions they take and fail to take concerning these children.

141. The problems faced by children in Defendants' custody are both epidemic and long-standing. The Defendants have failed to discharge their legal responsibilities to Plaintiffs and the putative class members. Indeed, continued overcrowding and inadequately supervised foster homes and other out-of-home care facilities, resulting from Defendants' pattern and practice of not timely and properly moving children to permanency, expose children in Defendants' custody to the imminent risk of sexual and other abuse, neglect and other dangers while they remain in Defendants' care.

142. Defendants routinely fail to screen, oversee, monitor and visit the foster and pre-adoptive homes and foster and shelter facilities in which they place Plaintiffs and members of the putative class. Defendants, in fact, operate the foster care system with a much greater tolerance for child abuse committed by their own foster parents, group home parents and institutional personnel than by children's

biological families. Defendants have, as part of a pattern and practice, knowingly placed and retained Plaintiffs Tanya M., Hugh S., Sandra M., Laurie S. and Lillie S., Elaine R., Paul B., Matthew I., Rachel, Reggie B., John J., Leanne G., Tammy G., Cathy W., Melinda and Karina, Sandra M., Leslie F., Larissa, and other members of Plaintiffs' putative class, in foster care placements that were dangerous, abusive, neglectful, overcrowded, or wholly inappropriate to and incapable of meeting the children's individual needs.

143. Defendants have a pattern and practice of ignoring or inappropriately responding to complaints and other information identifying individual foster, shelter and pre-adoptive placements as dangerous, abusive, neglectful, overcrowded or inappropriate for specific children in Defendants' custody, including complaints concerning the placements of Plaintiffs Tanya M., Laurie S. and Lillie S., Matthew I., Tammy G., John J., and Leslie F., and other members of the putative class.

144. Defendants' pattern and practice of placing children in their custody into dangerous and overcrowded foster care settings and failing to respond adequately to complaints about such placements violate accepted professional standards, do not represent the exercise of competent professional judgment, are inconsistent with the purpose for which the children were taken into Defendants' custody, have caused and continue to

cause Plaintiffs and their putative class members serious injury, and are known to Defendants, who through their deliberate indifference have failed to remedy them.

145. In January 1995, a Grand Jury in Palm Beach County released a report, finding that: "Children alleged to be abused, neglected or abandoned in Palm Beach County are at significant risk for further abuse if they are taken into the custody of the Department of Health and Rehabilitative Services." (January 13, 1995 Grand Jury Report, p. 1.)[The Department of Health and Rehabilitative Services is DCAF's predecessor agency].

146. A major contributing factor to the placement and retention of Plaintiffs and the putative class members in dangerous, abusive, neglectful, overcrowded and inappropriate placements is the large workload of Defendants' caseworkers, their high level of turnover, and the lack of adequate and meaningful supervision, training and management of the caseworkers, all of which lead to inadequate supervision and oversight of children in Defendants' custody.

147. In a budget document Defendants prepared for FY2000-01, they project that they need an additional 833 DCAF out-of-home counselors to meet the professionally accepted workload standard for this type of caseworker. DCAF out-of-home counselors supervise and provide services to children and their families while the children are in foster care or

relative placements and during the first six months following a child's reunification with the biological family. Defendants, however, have requested funding for only 104 out-of-home counselors (12.5% of the need as calculated by Defendants). Similarly, they are seeking only half the needed increase in both non-supervisory support personnel, whose functions are essential to the efficient use of the out-of-home counselors, and family support workers, who are intended to free the out-of-home counselors to concentrate on their primary mission of working with the child, parents and foster parents to achieve permanency for the child. (Budget Document, at 152-156.)

148. As a result of excessive workloads, Defendants' out-of-home counselors do not visit Plaintiffs and the putative class members in their placements with sufficient frequency or in a manner that is adequate to ensure such children's safety. Such failure contravenes accepted professional standards, does not represent the exercise of competent professional judgment, has harmed and continues to harm Plaintiffs Jay D. and Candice D. and other putative class members. Defendants permit this practice of failing to visit and supervise children in out-of-home placement to continue as a result of their deliberate indifference to the children's need for safety.

149. Also significantly contributing to the placements and retention of Plaintiffs and their putative class members

in dangerous, abusive, overcrowded, neglectful or inappropriate placements is Defendants' failure to develop, and the resulting lack of a sufficient number and array of placements, to facilitate Defendants' selection of a safe and appropriate placement for each child in their custody. Defendants are fully aware of the lack of an adequate number and array of appropriate placement and have acted with deliberate indifference to the plaintiffs' and class members' need for safe and appropriate placements.

150. Defendants have knowingly engaged in a pattern and practice of placing some foster children, including Plaintiffs Leslie F., Sandra M., Rachel C., Paul B., Hugh S. and Tammy G., on a long-term basis in a temporary shelter or in a group placement because of the unavailability of a foster home that will accept the child.  These placements are inappropriate, contravene competent professional judgment, and have harmed and continue to harm these Plaintiffs and other class members.

151. While Defendants have failed to develop an array of foster care settings in sufficient numbers to ensure a safe and secure placement for each foster child, this deficiency is particularly glaring with respect to certain types of placements. Among these are foster homes for large sibling groups and teenagers. DCAF has recognized the need to focus its recruitment efforts on these types of placements [Defendants'

web site, www.state.fl.us/cf_web/fs/fostercare/issues.html], but has failed to take adequate and reasonable steps to address this acknowledged need.

152. As a result of the lack of foster homes for large sibling groups, Defendants unnecessarily separated Plaintiffs Tanya M., Reggie B. and Rebecca B., Laurie S. and Lillie S., Tammy G and Leanne G., Leslie F., Elaine R., and Melinda and Karina and other class members from their siblings. As a result of a lack of foster homes and other placements for teens, Plaintiff Hugh S. Paul B., Rachel C., Sandra M., Tanya M., Leslie F., Melinda and Karina and other class members have been placed in dangerous and wholly inappropriate placements. Defendants' failure to recruit, develop and maintain a sufficient number of foster homes for large sibling groups, teenagers, and other groups of foster children who have a foreseeable need for earmarked foster homes violates accepted professional standards, has harmed and continues to harm Plaintiffs Tanya M., Reggie B. and Rebecca B., Laurie S. and Lillie S., Tammy G., Leanne G., Leslie F., Elaine R., Melinda and Karina and Hugh S. and other class and members.

153. Defendants know Plaintiffs and their putative class members have been and continue to be placed and retained in dangerous, abusive, overcrowded, neglectful or inappropriate placements but have failed to address or remedy that practice or the underlying actions and inactions that cause or significantly contribute to it.

154. In Defendants' budget document, they state:

> There has been a significant increase in the need for out of home care placement options for children who have been identified as victims of child abuse or neglect. Over the next two years the department is expecting continued increases in the number of children requiring out of home care placements. There has not been a parallel increase in the number of available foster homes or specialized group homes for children who need to be placed out of their homes. This has resulted in over-crowded conditions in current foster homes and other related facilities. This has caused some districts to pay for children and staff to be housed in motels. The overcrowding of foster homes places children at serious risk of being harmed by other children; places unrealistic expectations for care and supervision on foster parents; and ultimately leads to their rapid turnover.

Foster homes are also overcrowded because the population needing placement continues to rise, in part, because Defendants fail to achieve adoption or other type of discharge expeditiously for the children already in foster care.

155. Even if Defendants are able to develop the needed out-of-home placements, they will not have an adequate number of out-of-home counselors and supervisors to supervise and serve the children in these placements.  Defendants will, therefore, continue to fail to fulfill their obligation to protect Plaintiffs and the members of the putative class. Given the out-of-home counselors' workload, it will simply be impossible to supervise these children's placements adequately.

156. Children require stability and security to grow and develop. It is contrary to sound professional judgment to move a child from foster care placement to foster care placement except in extraordinary circumstances when the movement is needed to protect the child from harm or to provide a specialized placement that is designed to meet the child's specific needs. Multiple moves, including night-to-night placements, and sleeping in motels instead of houses are needlessly, inescapably traumatic to a child, undermining the child's stability and security, and causing the child to suffer an injury.

157. Defendants have a pattern and practice of moving children in their custody repeatedly in contravention of competent professional judgment and have knowingly permitted this practice to continue as a result of their deliberate indifference to the children's need for a safe, stable and appropriate placement. In some cases, these moves have been caused by Defendants' initial failure to exercise professional judgment that resulted in the child's placement in a dangerous, abusive, neglectful, overcrowded or inappropriate foster home or facility, from which the child then had to be removed. This pattern and practice of subjecting children in Defendants' custody to multiple, unwarranted placements has injured Plaintiffs Tanya M., Hugh S., Sandra M., Laurie S. and Lillie S., Reggie B. Tammy G., Paul B., Leslie F., Jay D. and

Candice D., Melinda and Karina, and Bonnie L., and other members of the putative class.

158. A factor that contributes to Defendants' repeated replacement of foster children into new settings is Defendants' lack of an efficient and competent mechanism or procedure for locating vacant foster care beds, identifying the characteristics of the children for whom the foster homes and facilities with vacancies would be appropriate, matching the children in need of a placement with appropriate vacancies, and expeditiously placing each child in an appropriate placement. Defendants are fully aware of the lack of such a process, but have not remedied this deficiency as a result of their deliberate indifference to the children's need for a safe, stable and appropriate placement. The absence of a mechanism for identifying settings that are appropriate for each child in need of a placement contravenes professional standards and precludes Defendants from exercising competent professional judgment in selecting placements for children in their custody.  Plaintiffs Paul B., Tanya M., Cathy W., Sandra M., Rachel C. Laurie S. and Lillie S., Hugh S., Reggie B. and Leslie F. and other putative class members have been or will be placed in inappropriate placements, requiring subsequent replacement, and have been or will be harmed as a result.

159. Defendants often move children to a new placement because the foster parent has demanded the child's removal,

frequently because of the child's allegedly disruptive behavior. Children who have undergone abuse or neglect that is sufficiently serious to require their removal from their biological families have suffered such great trauma that disruptive behavior can be expected from them. Indeed, Defendants recognized this in their Budget Document:

> Many children placed in foster care display serious, chronic and disruptive behaviors as a result of the trauma and loss they have experienced. Foster parents need techniques and tools to help them manage these extremely difficult behaviors. Foster parents frequently request that children be removed from their homes because of the children's disruptive behaviors.

(Budget Document, at 156).

160. Defendants violate accepted professional standards by failing to prepare foster parents to deal with the predictable behavior of the children placed in their homes, although Defendants have foreseen both this type of behavior and how it undermines the stability of placements, and by failing to support the foster parents with services and other types of help to make it possible for the child to be maintained in the foster home. Defendants have thus acted with deliberate indifference to the children's need for safe, stable and appropriate placements. This deficiency has harmed and continues to harm Plaintiffs Sandra M., Tanya M., Reggie B., and Leslie F., and other members of the putative class.

161. Defendants also have a pattern and practice of failing to identify relatives who are competent and willing to provide safe and appropriate care for children in Defendants' custody. If Defendants assessed and utilized these capable family members as placement resources, instead of ignoring or actively discouraging relatives (which is currently the case), Defendants would: partially relieve the overcrowding in existing out-of-home placements; avoid placing children in dangerous, abusive, neglectful or inappropriate placements; provide the children placed with relatives with the most appropriate care available; and facilitate the placement of siblings together and foster children's visitation with their separated siblings. It would also increase the likelihood that the children would expeditiously achieve permanent placements and be provided with permanent families.

162. Defendants have injured Plaintiffs Laurie S. and Lillie S., Reggie B. and Rebecca B., John J., Bonnie L., and other members of the putative class by ignoring or actively discouraging possible relative placements and, instead, placing these children into dangerous, abusive, neglectful or overcrowded stranger-placements that were not appropriate and could not meet these children's individual needs. This practice violates accepted professional standards and does not reflect the exercise of competent professional judgment. Defendants, moreover, know of both the insufficiency of the

number and array of out-of-home placements available to care for the children in their custody and the policy and practice of failing to use relatives or discouraging them from being foster or adoptive resources. Defendants have acted with deliberate indifference to Plaintiffs' and the putative class members' need for appropriate and safe placements.

163. Defendants have a pattern and practice of excluding from the decision-making process concerning individual foster children, the foster children themselves and some responsible adults who are deeply involved with the children and possess critically important information about them. This practice violates accepted professional standards, is outside the scope of professional judgment and defies logic. It has injured Plaintiffs Jay D. and Candice D., Melinda, and Bonnie L. and other putative class members by depriving them of even the possibility that Defendants will engage in fully informed and competent decision-making concerning matters that are critical to the children's well-being and development. Defendants know of this pattern and practice and its detrimental effect on the life-altering decisions made concerning children in their custody, but have been deliberately indifferent to its existence and effect on children and have failed to stop it from occurring.

164. Defendants routinely fail to provide children in their custody with needed medical care for acute, chronic and

congenital conditions or with treatment prescribed by a physician. This pattern and practice, which is known to Defendants, contravenes accepted professional standards and reflects both a failure to exercise professional judgment and deliberate indifference to the medical needs of Plaintiffs and the putative class members. Defendants have thereby injured and continue to injure Plaintiffs Matthew I., Reggie B. and Leanne G. and other members of the putative class.

165. Defendants have a pattern and practice of allowing children in their custody and care to be subjected to the administration of psychotropic medications for the purpose of making it more convenient and easier to care for these children in an out-of-home setting, rather than for the improvement of the child's mental or emotional health.  The administration of such mind-altering drugs for a non-therapeutic purpose unreasonably and unnecessarily restrains these children's liberty and contravenes accepted professional practice. Defendants have undertaken this practice without the exercise of professional judgment and with deliberate indifference to the health and well being of the affected children. Plaintiffs Melinda and Karina and other members of the putative class have been subjected to this practice, which is known to Defendants and these children, have suffered serious injuries as a result.

166. Defendants systematically deprive children in their custody of access to an education. As a consequence of moving children from one placement to another, children's education is interrupted and impaired. Defendants do not monitor the educational performance of children in their custody to determine whether the child's educational performance is deteriorating or the child requires assistance in meeting educational goals. Defendants also routinely fail to provide educational assistance when a child in their custody needs it. Defendants do not ensure that children in foster care who have special educational needs have those educational needs met. The denial and interruption of the education of Plaintiffs Hugh S., Paul B., Leslie F., Melinda, Karina and other members of the putative class have resulted from Defendants' failure to exercise competent professional judgment. Defendants are aware of these systemic failings, but have acted with deliberate indifference to the children's educational needs, thereby seriously injuring these children.

167. Defendants have a pattern and practice of failing to provide children in their custody with adequate clothing or a timely paid clothing allowance, and as a result children in Defendants' custody are deprived of adequate and season-appropriate clothing. Defendants' Budget Document states: "Despite annual inflation, the clothing allowance has not been changed in six years. The current clothing allowance is

critically insufficient." Defendants' pattern and practice of failing to provide Plaintiff Hugh S. and other members of the putative class with adequate clothing injures these children, deprives them of a basic need, violates accepted professional standards. Defendants fail to provide foster children with adequate clothing because they do not exercise professional judgment in determining how to meet foster children's basic needs and they are deliberately indifferent to those needs.

168. Defendants have a pattern and practice of attempting to reunify foster children with their biological families when doing so remains obviously dangerous to the child. Defendants' obligation to prevent children in their custody from being harmed encompasses the decision whether it is safe to return a child to the biological family, as well as the decision to place a child in a particular foster, shelter or pre-adoptive placement.

169. Based on Defendants' own data, during the period covering the fourth quarter of FY98-99 through the second quarter of FY99-00, only 23.9% of the children in a licensed home or group care facility who exited foster care did not re-enter foster care within twelve months. Thus, 76.1% of these children did re-enter government custody within twelve months, indicating their biological families pose an immediate danger to their safety, health or well being. Defendants' performance (23.9%) fell far short of Florida's own standard that over 95%

of the children should not reenter foster care within twelve months, as well as the State's interim goal that 70% of the children should not reenter care. Every DCAF district was identified as "Attention Needed" on this performance indicator. (Florida Department of Children and Families, "April 2000 Situation Report," Table FSP-026).

170. Defendants' decision that these putative class members should be discharged from foster care created a known and imminent danger to them, was contrary to competent professional judgment, was undertaken with deliberate indifference to the children's safety, and caused these children serious injury. Moreover, every Plaintiff, with the possible exception of Melinda, and every putative class member currently in Defendants' custody are at immediate risk that Defendants will decide they should be discharged home without an adequate assessment of the safety of the parental home.

171. Children are placed into Defendants' custody in order to provide them with temporary care that is safe and appropriate because their biological families are unable or unwilling to do so. Except in extremely rare situations, retaining children in government custody for long periods of their childhood is not reasonably related to the reason the children were taken into government custody and is contrary to competent professional judgment.

172. Defendants have a pattern and practice of retaining children in foster care for longer periods than is necessary or appropriate. Plaintiffs Laurie S. and Lillie S., Sandra M., Hugh S. Reggie B. and Rebecca B., Melinda and Karina, Bonnie L., Jay D. and Candice D., Leslie F. and other members of the putative class have been held in foster care for an unnecessarily long period of time, have thereby been deprived of an opportunity for a permanent family, and have been seriously and permanently injured. Defendants have retained these children in foster care for excessive amounts of time because they have failed to exercise professional judgment in identifying and implementing the reasonable steps needed to discharge these children to an appropriate permanent living arrangement with their biological family, through adoption or otherwise.

173. Not only does an extended stay in "temporary" foster care harm a child by depriving him or her of the stability and support of a permanent family, but, as Defendants know, the longer children are in foster care: the less likely they are to be adopted; the more likely they are to be abused by their DCAF-approved custodians or others in the DCAF-selected placements; the more likely they are to be moved into new placements and consequently into new schools, disrupting both their development and education; and the more likely they are to become truant, delinquent, or both. Each of these

consequences has caused or will cause additional injury to Plaintiffs Hugh S., Paul B., Rachel C., Cathy W., Melinda, Karina and other putative class members. Additionally Defendants' practice of keeping children in foster care for unreasonably long and harmful periods of time causes the foster care population to increase, resulting in even further overcrowding and greater risk of harm.

174. According to Defendants' own data, dependent children in licensed homes and group homes as of May 2000 remained in Florida foster care for an average of 33.8 months. In Miami-Dade County, the average length of stay was 55 months. For Florida's foster children, the average length of stay exceeds the 12 month standard recognized by the state, and the longer 18-month federal standard. As of May 2000, only 28.7% of the dependent children in licensed foster homes and group care left Defendants' custody within the twelve month time frame adopted by the State of Florida. In Miami-Dade County, only 11.4% of the foster children exited care within twelve months. Conversely, Defendants have recognized that having 72% of the children exit care within twelve months is the federal target and 80% constitutes "good" performance. The abysmal result of the Defendants' pattern and practice of needlessly keeping foster children in custody for longer than the pertinent federal and state time limits is evident from the Defendants labeling all the districts as "Attention

Needed" on this indicator.  (Florida Department of Children and Families, "April 2000 Situation Report," Tables FSP-003, FSP-027).

175. When a child is first removed from the biological family, accepted professional judgment requires in most cases that Defendants provide necessary services to the biological family to attempt to facilitate reunification, assuming the parents are alive and their whereabouts are known. In most cases, this requires the assessment of the biological family's needs and provision of services designed to ameliorate the problems that necessitated the child's placement. Unless Defendants make some attempt to facilitate reunification, their efforts to move the child to permanency through adoption may be precluded or significantly delayed, even when adoption appears to be the only avenue to permanency open to the child. Defendants have a pattern and practice of failing to provide the services needed by the biological families of children in out-of-home care, delaying reunification even where it is appropriate.

176. If reunification with the child's biological family cannot be safely accomplished within a reasonable amount of time, accepted professional standards require the government foster care agency to secure an alternative permanent family for the child, either with a relative or through adoption. When adoption is the appropriate approach to achieving

permanency, Defendants must petition for termination of parental rights and, concurrently locate and approve a qualified and appropriate adoptive family. Failing to take these steps when adoption is appropriate does not represent competent professional judgment, deprives the child of a real family and causes a permanent and serious injury to the child.

177. Defendants' most recent available data show that for FY1998-99, only 68.2% of the children eligible for adoption were actually adopted, although the State's own standard was 90%. [Defendants asserted that "about 88% is an upper limit on this measure in Florida"]. As poor as Defendants' performance is on this measure, it deceptively does not take into account the thousands of children who should be available for adoption but for whom Defendants have as yet failed to take the steps needed first to change their permanency goal and then to free them for adoption. Defendants further stated that the "denominator for this measure includes many children who have not yet been placed and some who will never be placed." (Florida Department of Children and Families, "Summary Report of FY1998-1999 Performance Based on Exhibit D-2A," (August 31, 1999), at 10. (Emphasis supplied).

178. Defendants have a pattern and practice of too quickly giving up on finding adoptive families for children who cannot be returned to their biological families or placed permanently with a relative. Plaintiffs Bonnie L. and Sandra

M. and other members of the putative class have been and
continue to be seriously harmed by this practice, which is
well known to Defendants.

179. For years, Defendants have attempted to excuse or
justify their failure to comply with accepted professional
standards concerning the inappropriateness of keeping children
in government custody for extended periods of time by claiming
not to be able to <u>find</u> adequate adoptive homes, or sufficient
foster homes for that matter. For thousands of children,
Defendants do not even <u>look</u> for families.  Defendants,
moreover, wait such an unacceptably long time to begin to
consider and work toward adoption that the children have been
seriously damaged by their foster care experience, making it
increasingly difficult to find adoptive homes willing and able
to care for them.

This pattern and practice has been identified and
condemned by many over the years, including the 1978 Dade
County Grand Jury, yet still shamefully continues without
interruption. Defendants' perception that it is impossible to
recruit a sufficient number of adoptive homes has resulted in
foster children being deprived of their right to Defendants'
professionally competent efforts to seek and obtain a
permanent, legally secure family for them. Further, if the
system had functioned properly since Defendant Bush's
Administration took office in January 1999, the thousands of

children who have remained in foster care too long would no longer be in Defendants' custody, but would be children living with loving, stable, permanent families. Instead, a significant number of children in Defendants' custody today [the majority] were already in custody in January 1999; most appear no closer to permanency than they were in January 1999.

180. In order to achieve permanency for foster children more expeditiously, Defendants have identified their need for additional DCAF lawyers and legal support staff. Defendants expect this additional legal staff to increase the initiation and prosecution of termination of parental rights proceedings and generally to speed children's transit through the foster care system. The end product of achieving these goals would be to improve the children's lives and decrease the foster care population, thus relieving some of the overcrowding in placements. To accomplish these purposes, Defendants found they need to add 497 attorneys, 248 paralegals, and 124 secretaries.  Defendants, however, only asked for funding for 25% of the unmet needs: 60 attorneys, 28 paralegals and 16 secretaries. [Budget Document, at 148]. Similarly, in connection with the request for additional out-of-home counselors, Defendants stated, "the fact that there is a severe shortage of staff limits the Defendants' ability to be totally successful" in "find[ing] alternatives to placing children in out of home care and to reducing the length of

time children remain in care." [*Id*., at 152]. Yet, Defendants asked for only 12.5% (104 of 833) of the unmet need for these critically important workers. [*Id*].

181. Defendants clearly know children are languishing in Defendants' custody rather than being moved toward having permanent, legally stable families of their own, despite established professional standards that such childhood-long government custody is harmful to children and must be prevented except in the rarest of cases. They have, however, failed to take meaningful steps to ameliorate this long-standing pattern and practice that violates the rights of Plaintiffs and the putative class members. Defendants have acted with deliberate indifference to the need of each child for a safe, legally stable permanent home.

182. A young person between the ages of 18 and 21 years may, in some cases, be allowed to remain in Defendants' custody. Defendants' decisions concerning which individuals will be permitted to remain in foster care past their 18th birthday are arbitrary, capricious and fundamentally unfair. Defendants, in fact, simply decide that some youngsters will be able to extend their stay in foster care while others will not.

183. Defendants' decision not to permit an individual to remain in foster care after reaching 17 years of age can and, for many young people does, create an immediate, known and

unnecessary danger to the individual because of the young person's inability to live independently without the protection and support of the government custodian. Many of these youngsters, including Plaintiffs Leslie F. and Melinda, have been in foster care for much of their childhood because Defendants never arranged a permanent family placement for them, and consequently, they have no family or other adults on whom they can rely for financial and other support once they leave foster care. Also like Plaintiffs Leslie F. and Melinda, many of these young people have educational and other deficiencies and problems that were caused or exacerbated by Defendants' actions and omissions, which have rendered these youngsters unable to live independently upon reaching their majority.

184. Defendants have a pattern and practice of making arbitrary and capricious decisions concerning which foster children will be allowed to remain in Defendants' custody after their 18th birthday. These decisions have deprived or imminently threaten to deprive Plaintiffs Leslie F. and Melinda and other putative class members of an important government benefit and to place them in unnecessary, immediate and foreseeable danger created by Defendants' decision to discharge them from care, causing them serious and irreparable injury.

185. Defendants operate a subsidized Independent Living Program that pays directly to a child 16 years of age or older the foster care maintenance payment usually paid to a foster care provider (foster parent or agency) to allow the youngster to live in an unlicensed setting independent of daily supervision of a responsible adult but under the on-going supervision of a DCAF caseworker or other adult approved by DCAF. These benefits can continue past the youngster's 18th birthday. Defendants' decisions concerning which individuals will be permitted to participate in the subsidized Independent Living Program are made without full information from the child as well as persons with knowledge of the child and are arbitrary, capricious and fundamentally unfair. Again, Defendants simply decide that some youngsters will receive this substantial government benefit and others will not.

186. Neither Plaintiff Melinda nor Plaintiff Leslie F. was selected to participate in Defendants' subsidized Independent Living Program. For these young people, as well as many other putative class members, exclusion from this program deprives them of the opportunity to prepare adequately to live independently once they are discharged from foster care. The denial of the associated Independent Living cash benefit further precludes them from sustaining themselves financially and exposes them to brutal and overwhelming need for the monetary support.

187. Defendants have a pattern and practice of making arbitrary and capricious decisions concerning which foster children will be allowed to participate in the subsidized Independent Living Program and receive the cash payment associated with it. Defendants' decision to exclude Plaintiffs Leslie F. and Melinda and other members of the putative class from the subsidized Independent Living Program has arbitrarily and capriciously deprived them of an important government benefit, causing them serious and irreparable injury.

188. Defendants have consistently disregarded their obligations toward the innocent abused and neglected victims who languish, almost invisibly, in DCAF foster placements. The invisibility is due, at least in part, to Defendants' subversion and misuse of the confidentiality that protects certain records; they misuse the confidentiality to shield themselves and the deficient operation of Florida's foster care system - not the affected children or families - from scrutiny.

189. The 1995 Palm Beach County Grand Jury Report re-recommended areas of change first urged in the December 14, 1993 report of the Fifteenth Circuit Grand Jury, and asked for a statewide Grand Jury. Defendant Bush and his predecessors in office have still not petitioned the Florida Supreme Court to impanel such a statewide Grand Jury. Indeed, the only known statewide quality assurance review was conducted in 1994 and

finalized in 1995; Defendants have intentionally provided no quality control assessment since. It is impossible for Defendants to operate the Florida foster care and adoption programs appropriately and with adequate protection for children in the absence of meaningful programmatic compliance and performance evaluations.

190. Defendants' deliberate indifference to the rights and serious needs of the children in their custody and their pattern and practice of failing to exercise competent professional judgment in the operation of the Florida foster care system have directly and proximately caused Plaintiffs and the putative class members to be deprived of safe placements that meet their basic needs, as well as permanent, legally stable families. All of these violations of the rights of Plaintiffs and the putative class members have resulted in serious physical, mental and psychological injuries to these already damaged and vulnerable children and the irretrievable loss of the opportunity to develop in accordance with their inherent abilities.

### 2. Violations of Plaintiffs' Procedural Due Process Rights

191. When state law creates an entitlement to a benefit, Defendants cannot deny the benefit to an individual without providing that person with notice and a fair and adequate procedure for challenging the denial or, in some limited

circumstances, without requiring a professional qualified by appropriate training, credentials and experience to determine, through the exercise of independent professional judgment, whether a course of action is appropriate for the individual.

192. The State of Florida has created entitlements on behalf of Plaintiffs and the putative class members that Defendants cannot deny to such children without adequate procedural protections or in an arbitrary and capricious manner. Defendants have failed to provide any procedures for a meaningful administrative hearing or professional review of the deprivation of these benefits. Among these entitlements are:

     a. Caseworker supervision of children in foster care: at least monthly, the DCAF out-of-home counselor will visit the foster child and foster parents in the foster home, Florida Administrative Code, § 65C-13.010(5)(g);

     b. Caseworker supervision of children in shelter care: while a child in Defendants' custody is in shelter care, the DCAF protective investigator or service counselor will make at least two contacts with the child per week, at least one of which must be face-to-face with the child and shelter parent or provider; and during the visitation, the DCAF worker must evaluate the condition of the shelter home or facility, whether the licensed

capacity of the shelter has been exceeded, the treatment received by the child and other children in the shelter, and other factors that affect the child, Florida Administrative Code, § 65C-12.008(3);

c. Medical care: when there are indications a foster child has sustained a physical injury or is suffering from an illness, a licensed health care professional shall be immediately called or the child shall be taken to the nearest available hospital for emergency care, Fla. Stat. § 984.19(5).

d. Remaining in foster care after reaching majority: an individual may remain in Defendants' custody following the person's 18th birthday (subject to limitations on the duration of the in-care period) if:  the individual is enrolled in high school, a program leading to a high school equivalency diploma, or a full-time career education program, or is enrolled full-time or accepted for admittance in a postsecondary vocational-technical education program, a community college program leading toward a vocational or an associate degree, or a university or college; the person was committed to the legal custody of DCAF for placement in foster care as a dependent child; and all other resources have been thoroughly explored and it can be clearly established

that there are no alternative resources for placement, Fla. Stat. § 409.145(3); and

e. Participation in the subsidized Independent Living Program: a cash benefit and opportunity to live independently under the supervision of a DCAF caseworker or other responsible adult approved by DCAF; Fla. Stat. § 409.165(4)(b).

193. Defendants, moreover, have not established, nor have they provided to Plaintiffs and the putative class members, a procedure by which they can apply to Defendants either to remain in foster care beyond their 18th birthday or to participate in the subsidized Independent Living Program. In the alternative, if a procedure exists either to apply for or to challenge the denial of either of these benefits, Defendants do not give Plaintiffs and the putative class members notice of such procedures or as in the case of Melinda and some putative class members, coerce and mislead the child into signing documents relinquishing these benefits, expressly ignoring and precluding input from the children's court-appointed attorneys or guardians ad litem.

194. Defendants' failure to establish a process for an administrative hearing or professional review of decisions to deny Plaintiffs and the putative class members the benefits to which they are entitled, or to have an application procedure or give notice of such procedure for benefits for which

eligibility criteria exist, constitutes a pattern, practice and policy of depriving Plaintiffs and the putative class members due process of law. Plaintiffs Jay D., Candice D., Matthew I., Reggie B. Leanne G., Leslie F. and Melinda and other putative class members have been and continue to be seriously and irreparably injured as a result of this pattern and practice.

195. Defendants' failure to provide Plaintiffs and the class members with the process that is due when they deny the above-described entitlements to such children constitutes deliberate indifference to the legal rights of these children.

196. The Florida Dependency Court conducts periodic reviews of the legal, custodial and permanency status of each child in Defendants' custody as an abused or neglected child. These review hearings continue at least until a child who is free for adoption has been placed for adoption. The child is a party to the proceeding and has a right to be present at any hearing unless the Dependency Court specifically finds the child's mental or physical condition or age would render a court appearance contrary to the child's best interest. Section 39.01(52), Florida Statutes; Florida Rules of Juvenile Procedure, Rules 8.210, 8.255, 8.415. The Department routinely gives notice to the parties, other than children, of such judicial reviews. Some periodic reviews for some children over 13 years of age are administrative, rather than judicial. They

also address the custodial and permanency status of the child. Children with sufficient maturity are entitled to participate in the administrative review. Florida Administrative Code, § 65C-13.019. Defendants are also required to include children, "when appropriate", in DCAF's development of a case plan for the child. Florida Rules of Juvenile Procedure, Rule 8.400. The case plan is the basic operating document for each child in Defendants' custody, describing the on-going appropriateness of government custody and the child's current placement, the services to be provided by DCAF to the child and the child's biological and foster parents need, the child's permanency goal, and other critical planning information. Planning is to include Independent Living and the extension of foster care services beyond the age of 18.

197. To a significant degree, the judicial and administrative periodic reviews and case plans determine what a foster child's present and future life will be like and whether the child will achieve permanency. These proceedings and plans are of the utmost importance to the child's long and short-term well being, and the child has the greatest stake of any party in their outcome. No other party or participant in these proceedings or in developing the case plan, other than the child's attorney or guardian ad litem, if one is appointed, has an interest that never conflicts with that of the child.

198. As the child's custodian, Defendants have complete control over whether a child will be able to attend a judicial review hearing, administrative review conference or a case planning conference. A child can attend such a hearing or conference only if informed of it. Children in Defendants' custody are dependent on DCAF to provide transportation to a judicial hearing or an administrative case-planning conference.

199. Statistically, less than 50% of children in the foster care system have a guardian ad litem. At this time, there is no state program of attorneys for these children. So few children are represented by legal counsel that this is statistically irrelevant. Unless an attorney or guardian ad litem has been appointed for a child, Defendants have a pattern and practice of failing to notify children of judicial review hearings and administrative review and case planning conferences and of failing to provide transportation and other services the children need to be able to attend and participate in such hearings and conferences.

200. Defendants also do not have standards for determining when a child would be an appropriate participant in a case planning conference or has sufficient maturity to participate in an administrative review conference. In fact, Defendants rarely, if ever, provide children in their custody with an opportunity to participate in such conferences, and

Defendants' decision-making on this matter, or lack of it, is arbitrary and capricious. As in Melinda's case, even when an attorney or guardian is appointed, Defendants have a pattern and practice of ignoring said appointees and denying them input, further interfering with and denying foster children their due process rights.

201. Defendants' pattern and practice of denying foster children an opportunity to attend and participate in judicial review hearings and administrative review and case planning conferences deprives them of due process of law and constitutes deliberate indifference to the children's legal rights. Plaintiffs Leslie F. and Melinda and other members of the putative class have been and continue to be seriously and irreparably harmed as a result of this pattern and practice.

### 3. Violations of Plaintiffs' First, Ninth And Fourteenth Amendment Rights

202. Children have substantial associational and familial interests in continuing to reside with their siblings when they are taken into, and while they remain in, government custody, absent a compelling reason for their separation. Additionally, except when the separation of siblings is necessary to protect the health, safety or welfare of one of the children, it contravenes competent professional judgment to separate siblings who are in government custody. Only a professional qualified by training, credentials and

experience, who exercises independent professional judgment, is capable of making the required determination that placing siblings together would be contrary to the health, safety or welfare of one of the children. The separation of siblings without such a professional's determination, and periodic reappraisal, deprives the children of rights secured to them by the First, Ninth and Fourteenth Amendments to the United States Constitution.

203. In the event a professional determines placing siblings together in an out-of-home placement would be contrary to the health, safety or welfare of one of the children, such children have an associational and familial interest in frequent and regular visitation with each other. It would, moreover, be contrary to competent professional judgment to fail to provide such regular and frequent sibling visitation, absent a finding by a professional, qualified by training, credentials and experience and exercising independent professional judgment, that such visitation would be contrary to the health, safety or welfare of one of the children. The denial of regular and frequent sibling visitation in the absence of such a professional's determination, and periodic reappraisal of the decision, deprives the children of rights secured to them by the First, Ninth and Fourteenth Amendments to the United States Constitution.

204. Defendants have a pattern and practice of separating siblings who are in their custody and depriving them of regular and frequent visitation with each other, although placement together or visitation would not be contrary to the health, safety or welfare of any of the children and despite the absence of a qualified professional's independent determination that the joint placement or visitation would be detrimental to any of the children.  Plaintiffs Tanya M., Tammy G., Laurie S. and Lillie S., Leanne G., John J., Melinda and Karina, Elaine R., Leslie F., and other putative class members have been unnecessarily separated from their siblings who are also in Defendants' custody, have been deprived of regular and frequent visitation with their siblings, and have suffered a serious injury as a result. Defendants know of this practice and are deliberately indifferent to its effect on these children.

### 4. Violation of Plaintiffs' Rights Under the Adoption and Safe Families Act

205. The Adoption and Safe Families Act ("ASFA"), which amended Title IV-E of the Social Security Act, enacted as the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 et seq., imposed new obligations on Defendants, which they owe to Plaintiffs and the members of the putative class as children in government-supported foster care.

206. Under ASFA, Defendants are required to initiate a proceeding to terminate the parental rights to any child who has been in their custody for 15 of the most recent 22 months unless, at the option of the State, the child is in the care of a relative or unless (a) Defendants have documented in the case plan a compelling reason for determining that filing such a petition would not be in the best interests of the child or (b) Defendants have not provided to the child's family such services as Defendants deem necessary for the safe return of the child to the child's home, if such provision is required under the Act.   42 U.S. C. § 675(5)(E).

207. Defendants routinely fail to initiate termination of parental rights proceedings on behalf of children in foster care for 15 of the most recent 22 months, although none of the exceptions are applicable. Defendants also routinely, knowingly and intentionally fail to provide or choose not to provide the services they have determined to be necessary for the safe return of children in their care, thereby depriving those children of the right to permanency conferred by ASFA. These acts are part of Defendants' pattern and practice of deliberate indifference to the serious needs and rights of the children in their custody.  Plaintiffs Laurie S. and Lillie S., Sandra M., Hugh S., Reggie B. and Rebecca B., Melinda and Karina, Bonnie L., and members of the putative class have been injured by these practices of Defendants.

208. ASFA also requires Defendants to have, review, update and provide to each foster parent or foster care provider a health and education record for each child placed in such home or facility. 42 U.S.C. § 675(5)(D). Defendants routinely fail to obtain the required education and health information, review and update it, or provide a record containing the specified information to each foster home or facility in which a child in Defendants' custody is placed. On information and belief, Defendants failed to fulfill these obligations with respect to Plaintiffs Matthew I., Reggie B., Leanne G., Melinda, Karina, other Plaintiffs, and other members of the putative class, and as a result, such children have been injured and have not received needed attention to their health and educational needs.

### 5. Violations of Plaintiffs' Rights Under the Early and Periodic Screening, Diagnosis and Treatment (EPSDT) Provisions of the Medicaid Title

209. Under the EPSDT provisions of the Medicaid Title of the federal Social Security Act, Defendants are required to ensure that all Florida Medicaid-eligible children up to the age of twenty-one years, including Plaintiffs and the members of the putative class, receive comprehensive physical, developmental and mental health care. Among the services Defendants are required to ensure Plaintiffs and the putative class members receive are:

a. Periodic comprehensive health screens, at the age-appropriate intervals deemed proper by a board of medical professionals, including general physical examinations, eye examinations, dental examinations, hearing examinations, lead blood tests, and vaccinations or boosters, all performed by competent medical professionals; and

b. Any and all follow-up physical health services or treatment deemed necessary to treat or address any condition diagnosed at any periodic screening, performed in a timely manner, regardless of whether any such treatment or service is otherwise covered by the Florida Medicaid plan.

210. Defendants routinely fail to ensure that Plaintiffs and the putative class members are given general physical examinations, eye examinations, dental examinations, hearing examinations, lead blood tests, and vaccinations or boosters, at the specified times and that these children receive timely and needed follow-up physical health services and treatment. Defendants are fully aware of their EPSDT obligations and the pattern and practice of failing to meet these requirements. As a result of Defendants' failure to fulfill their EPSDT obligations, Plaintiffs Matthew I., Reggie B. and Leanne G. and other members of the putative class have been injured.

6. Violations of the Rights of Plaintiffs
Paul B., Leslie F., Laurie S. and Lillie S.,
Tammy G., Leanne G., Melinda and Karina and the Putative
Subclass Under Title VI of the 1964 Civil Rights Act

211. The State of Florida, DCAF and Defendants are
recipients of federal financial assistance through the United
States Department of Health and Human Services ["DHHS"] for
the Florida foster care and adoption program and the child
welfare services program.

212. Title VI of the 1964 Civil Rights Act prohibits any
state program or activity that receives federal financial
assistance from excluding from participation, denying benefits
to or subjecting to discrimination, any person on the basis of
race, color or national origin. 42 U.S.C. §§ 2000d et seq.; 45
C.F.R. § 80.3.

213. DHHS has promulgated regulations, pursuant to Title
VI, that prohibit any state programs or activities that
receive federal financial assistance that are subject to the
regulations from utilizing criteria or methods of
administration which have the effect of subjecting individuals
to discrimination because of their race, color, or national
origin, or have the effect of defeating or substantially
impairing accomplishment of the objectives of the program with
respect to individuals of a particular race, color, or
national origin. 42 U.S.C. § 2000d-1; 45 C.F.R. § 80.3. These

regulations apply to the operation of the Florida foster care and adoption program under Defendants' direction and control.

214. Defendants have a pattern and practice of treating Black foster children differently and less advantageously than White foster children, because of their race or color, with respect to access to, receipt of and the quality and value of services and benefits. Such difference in treatment constitutes illegal discrimination on the basis of race or color under Title VI and affects, among other aspects of Defendants' foster care and adoption programs, the number of times foster children are moved from one placement to another, the timing and tenacity with which Defendants pursue permanent families for foster children, and the identification of and placement of the child with an appropriate permanent family. Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina and the members of the putative subclass have suffered and continue to suffer serious and irreparable harm as a result of Defendants' actions that are discriminatory on the basis of race or color.

215. Defendants have a pattern and practice of utilizing racially neutral criteria or methods of administration that have the effect of subjecting Black foster children to discrimination because of their race or color or have the effect of defeating or substantially impairing accomplishment of the objectives of the foster care and adoption program for

Black foster children because of their race or color. Defendants' inadequate operation of the Florida foster care and adoption system injures all children in Defendants' custody, but has an even more deleterious effect on Black foster children than on White foster children. When such racially neutral criteria or methods of administration have an illegal disparate impact by race or color, they constitute discrimination on the basis of race or color proscribed by Title VI.

216. Among the racially neutral criteria and methods of administration Defendants employ that discriminate against Black foster children on the basis of their race or color are the efforts Defendants make to recruit foster and adoptive families, the efforts Defendants make to move foster children expeditiously to permanency, the types, quantity and quality of services and benefits provided to the biological parents or relatives of children in Defendants' custody for the purpose of moving the children to permanency, the process of selecting a foster family or facility that is appropriate for an individual child, and the recruitment and training of DCAF staff who work with foster children.

217. These racially neutral criteria and methods of administration have the effect of subjecting Black foster children to discrimination because of their race or color and have the effect of defeating or substantially impairing

accomplishment of the objectives of the foster care and adoption program for them. Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina and the members of the putative subclass have suffered and continue to suffer serious and irreparable harm as a result of Defendants' practices that have a disparate impact on and disadvantage Black foster children.

### G. PLAINTIFFS HAVE NO ADEQUATE REMEDY AT LAW

218. Paragraphs 1 through 137 and 139 through 217 are incorporated herein by reference.

219. Plaintiffs and the putative class members have and continue to suffer irreparable harm by Defendants' above-described acts and omissions and do not have an adequate remedy at law, thereby making appropriate declaratory and injunctive relief.

### H. CAUSES OF ACTION

220. Paragraphs 1 through 137 and 139 through 217 are incorporated into each Cause of Action (First through Sixth) set forth below.

### 1. First Cause of Action - Substantive Due Process

221. The foregoing actions and inactions of Defendants are inconsistent with the exercise of competent professional judgment; deprive Plaintiffs and the putative class members of basic needs while in government custody; create conditions of care, treatment and duration of custody that are inconsistent

with the purpose for which Defendants took Plaintiffs and the putative class members into custody; comprise arbitrary and capricious decision-making; and amount to a pattern, practice and custom of deliberate indifference to the serious and constitutionally protected rights and needs of Plaintiffs and the putative class members. As a result, Plaintiffs and the members of the putative class have been deprived of the substantive due process rights conferred on them by the Fourteenth Amendment to the United States Constitution. These rights include, but are not limited to: the right to have their basic need for food, clothing, safe care, shelter, medical care and education met; the right to protection from unnecessary harm, injury or deterioration; the right not to be harmed while in state custody; the right not to be unnecessarily deprived of their liberty by retention in state custody; the right not to have their liberty unnecessarily restrained by the use of chemical agents for non-therapeutic purposes; the right to treatment and care that, in terms of its nature, conditions and duration are consistent with the purposes for which they were taken into government custody, including safety, protection from abuse, neglect and abandonment; the right not to be retained in state custody longer than necessary to accomplish the purposes to be served by state custody;  the right to receive care, treatment and services consistent with the exercise of competent

professional judgment; the right to be protected from state-created dangers, including placement in dangerous, abusive, overcrowded or neglectful out-of-home placements or returned to a dangerous condition in the home of the child's biological family; and the right to eligibility determinations that are not arbitrary or capricious.

     2.  <u>Second Cause of Action – Procedural Due Process</u>

     222.  The foregoing actions and inactions of Defendants deprive Plaintiffs and the putative class members of state-created entitlements without providing an adequate and fair procedure, including: a professional review of any failure to provide required caseworker-child contact and visits or to obtain immediate medical consultation when a foster child exhibits an indication of injury or illness; an opportunity to submit an application to remain in foster care after reaching 18 years of age or to participate in the subsidized Independent Living Program; an opportunity for an administrative hearing to challenge an adverse decision on any such application; and notice of any process by which such an adverse decision on an application can be reviewed. Defendants further deprive Plaintiffs and the putative class members of their right to be present and provide meaningful input at judicial review hearings and administrative review and case planning conferences. Such lack of fair and adequate process with respect to the above-listed benefits, hearings

and conferences deprives such children of due process of law
in violation of the Fourteenth Amendment to the United States
Constitution and amounts to a pattern, practice and policy of
deliberate indifference to the serious and constitutionally
protected needs and rights of Plaintiffs and the putative
class members.

### 3. Third Cause of Action - First, Ninth and Fourteenth Amendments

223. The foregoing actions and inactions of Defendants
that unnecessarily separate siblings in Defendants' custody
and unnecessarily deprive such separated siblings of frequent
and regular visitation are inconsistent with the exercise of
competent professional judgment in violation of the Fourteenth
Amendment to the United States Constitution; deprive such
children of associational and familial rights in violation of
the First, Ninth and Fourteenth Amendments to the United
States Constitution; deprive such children of constitutionally
protected liberty interests without adequate or due process in
violation of the Fourteenth Amendment to the United States
Constitution; and amount to a pattern, practice and custom of
deliberate indifference to the serious and constitutionally
protected needs of Plaintiffs and the putative class members.

### 4. Fourth Cause of Action - Adoption and Safe Families Act

224. As a result of the foregoing actions and inactions
of Defendants, Plaintiffs and the members of the putative

class are being deprived of rights conferred on them by the federal Adoption and Safe Families Act. These rights include, but are not limited to: the right to have Defendants initiate a proceeding to terminate parental rights when the child has been in Defendants' custody for 15 of the most recent 22 months, unless the child resides with a relative or Defendants have documented a compelling reason not to terminate parental rights; the right to have Defendants offer the child's biological family the services Defendants deem necessary for the safe return of the child to the child's home in order to trigger the child's right to have Defendants initiate a termination of parental rights proceeding; and the right to have Defendants obtain required education and health information, review it, update it, and provide the education and health record to each foster home or facility in which a child is placed. Defendants' failure to fulfill their obligations under ASFA amounts to a pattern, practice and custom of deliberate indifference to the serious needs and federally protected rights of Plaintiffs and the putative class members.

### 5. Fifth Cause of Action – Early and Periodic Screening, Diagnosis and Treatment

225. As a result of the foregoing actions and inactions of Defendants, Plaintiffs and the members of the putative class are being denied the rights conferred on them by the

Early and Periodic Screening, Diagnosis and Treatment (EPSDT) provision of the Medicaid Title of the federal Social Security Act. These rights include but are not limited to these children's right to receive periodic general physical health examinations administered by competent medical professionals at appropriate intervals determined by a panel of independent health care experts; their right to receive periodic hearing and eye examinations, dental examinations and lead blood tests, administered by competent medical professionals at age-appropriate intervals; their right to receive all necessary childhood vaccinations and boosters at appropriate times;  and their right to receive any and all treatments deemed necessary by a qualified medical professional conducting any of the above-mentioned periodic health examinations.  Defendants' failure to fulfill their EPSDT obligations amounts to a pattern, practice and custom of deliberate indifference to the serious needs and federally protected rights of Plaintiffs and the putative class members.

## 6. Sixth Cause of Action - Title VI

226. As a result of the foregoing actions and inactions of the defendants, Plaintiffs Paul B., Leslie F., Laurie S. and Lillie S., Tammy G., Leanne G., Melinda and Karina, and the members of the putative subclass are being denied the rights conferred on them by Title VI of the Civil Rights Act of 1964 and regulations promulgated by the United States

Department of Health and Human Services pursuant to Title VI. These rights include but are not limited to the right not to be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance; and the right not to have any state program or activity which receives federal financial assistance utilize criteria or methods of administration which have the effect of subjecting any person to discrimination on the ground of their race, color, or national origin, or which have the effect of defeating or substantially impairing the accomplishment of the objectives of the programs with respect to individuals of a particular race, color, or national origin. Defendants' failure to fulfill their Title IV obligations amounts to a pattern, practice and custom of deliberate indifference to the serious needs and federally protected rights of Plaintiffs and the putative class members.

PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and the members of the class and subclass they seek to represent, request that this Court:

A. Assume and retain jurisdiction over this matter;

B. Determine that this matter may proceed as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2);

C. Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, declare unconstitutional and unlawful: Defendants' failure to provide for Plaintiffs' and the putative class members' basic needs, safety, freedom from harm, freedom from unreasonable restraints on their liberty, care and treatment that is consistent with accepted professional judgment and the purpose for which the children were taken into government custody, freedom from being placed into unnecessary state-created danger, and freedom from arbitrary and capricious actions and decisions that deprive them of benefits to which they are entitled;  Defendants' deprivation of state-created entitlements without an adequate and fair procedure; Defendants' unnecessary separation of siblings in government custody and denial of reasonable and frequent visitation of such siblings without proper procedure; Defendants' failure to comply with the Adoption and Safe Families Act and the Early, Periodic Screening, Diagnosis and Treatment provisions of the Medicaid Title of the Social Security Act; and Defendants' discrimination on the basis of race or color in the operation of the foster care, adoption and child welfare services program for which Florida receives federal financial assistance;

D. Permanently enjoin Defendants from subjecting Plaintiffs and the members of the class they seek to represent to practices that violate their federal constitutional and

statutory rights, including those identified in paragraph "C" of this Prayer for Relief;

E. Order appropriate remedial relief to ensure Defendants' future compliance with the Constitution and laws of the United States and their provision of legally mandated services, protection and procedures to Plaintiffs and the members of the class they seek to represent;

F. Appoint an expert panel with full access to Defendants, their agents, records, clients and personnel, to develop and oversee the implementation of a plan for reform, which will ensure that Defendants protect the federal constitutional and statutory rights of Plaintiffs and the members of the class they seek to represent;

G. Appoint a permanent ombudsman or children's advocate to present the interests of Plaintiffs and their putative class members to Defendants and DCAF, to whom all children in Florida foster care will have open and confidential access and with whom Defendants or their designees with authority to make decisions on Defendants' behalf will meet regularly and frequently to attempt to resolve issues that affect individual or groups of similarly situated foster children.

H. Award plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. §§ 1920 and 1988; and

I. Grant such other further equitable and other relief as the Court deems just, necessary and proper to protect

John B. Ostrow, Esquire
Fla. Bar No.: 124324
Law Offices of John B. Ostrow,
P.A.
Miami Center Bldg, Suite 1380
201 S. Biscayne Blvd.
Miami, FL 33131
T - 305/358-1496
F - 305/371-7999

Carolyn Salisbury, Esquire
Fla. Bar No.: 074772
(pending admission pro hac vice)
Univ. of Miami School of Law
5915 Ponce de Leon Blvd #28
Coral Gables, FL 33146
T - 305/284-4321
F - 305/284-4384

Deborah Schroth, Esquire
Fla. Bar No.: 290629
(pending admission pro hac vice)
Florida Legal Services
126 W. Adams Street
Suite 502
Jacksonville, FL 32202-3849
T - 904/355-5200
F - 904/355-5223

Susan L. Stockham, Esquire
Fla. Bar No.: 342521
(pending admission pro hac vice)
2700 S. Tamiami Tr., Suite 17
Sarasota, FL 34239
T - 941/957-0094
F - 941/957-0084

John Walsh, Esquire
Fla. Bar No.: 0796360
(pending admission pro hac vice)
423 Fern Street, Suite 200
West Palm Beach, FL 33401
T - 561/655-8944 ext. 242
F - 561/655-5269

Bernard P. Perlmutter, Esquire
Fla. Bar No.: 455260
Univ. of Miami School of Law
5915 Ponce de Leon Blvd #28
Coral Gables, FL 33146
T - 305/284-3123
F - 305/284-4384

Gregory A. Samms, Esquire
Fla. Bar No.: 438863
9th Floor, New Times Towers
2800 Biscayne Blvd.
Miami, Fl 33137
T - 305/573-2444
F - 305/576-9113

Neil C. Spector, Esquire
Fla. Bar No.:280471
(pending admission pro hac vice)
1505 N. Florida Avenue
P.O. Box 800
Tampa, FL 33601
T - 813/229-0900
F - 813/229-3323

James Walsh, Esquire
Fla. Bar No.: 0796352
(pending admission pro hac vice)
423 Fern Street, Suite 200
West Palm Beach, FL 33401
T - 561/655-8944 ext. 243
F - 561/655-5269

Roy Wasson, Esquire
Fla. Bar No.: 332070
1320 South Dixie Highway
Suite 450 Gables One Tower
Miami, Florida 33146
T - 305/666-5053
F - 305/666-2636

Dianne Weaver, Esquire
Fla. Bar No.: 139778
Krupnick, Campbell, et al.
700 SE 3rd Avenue
Suite 100
Ft. Lauderdale, Fl 33316
T - 954/763-8181
F - 954/763-8292

Claudia Wright, Esquire
Fla. Bar No.: 251569
(pending admission pro hac vice)
Gator Teamchild
University of Florida
Levin College of Law
Post Office Box 117626
Gainesville, FL 32611-7626
T - 352/392-0412
F - 352/392-0414

### Of Counsel

Christina A. Zawisza, Esquire
Fla. Bar No. 241725
John M. Ratliff
Fla. Bar No. 402599
3305 College Ave
Ft. Lauderdale, Fla. 33314
T - 954/262-6027
F - 954/262-3832

### Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed on this 28TH day of August, 2000 to Maxine S. Ryan, Esquire, Assistant Attorney General, Office of the Attorney General, Civil Litigation Division, 110 S.E. 6th Street, 10th Floor, Fort Lauderdale, Florida 33301-5000 and Cecilia Bradley, Esquire, Assistant Attorney General, Office of the Attorney General, The Capitol - PL01, Tallahassee, Florida 32399-1050.

KAREN GIEVERS
Fla. Bar No.: 262005

Jerold Feuer, Esquire
Fla. Bar No.:
(pending admission pro hac vice)
402 N.E. 36th Street
Miami, FL 33137
T - 305/573-2282
F - 305/573-2285

Daniel Freyberg, Esquire
335 S. Plumosa Street
Suite D
Merritt Island, FL 32952
T - 407/459-2994
F - 407/459-9790

Leslie Goller, Esquire
Fla. Bar No.: 393932
Brown, Terrell, Hogan et al.
233 E. Bay Street, Fl. 8
Jacksonville, FL 32202
T - 904/632-2424
F - 904/353-4418

Wayne Hogan, Esquire
Fla. Bar No.: 142460
Brown, Terrell, Hogan et al.
233 E. Bay Street, Fl. 8
Jacksonville, FL 32202
T - 904/632-2424
F - 904/353-4418

Jorge A. Lorenzo, Esquire
Fla. Bar No.: 849596
(pending admission pro hac vice)
1001 N. Macdill Ave., Suite A
Tampa, FL 33607
T - 813/998-9529
F - 813/998-9329

Rose E. Firestein, Esquire
(pending admission pro hac vice)
Children's Rights, Inc.
404 Park Avenue South, 11th Floor
New York, NY 10016
T - 212/683-2210
F - 212/683-4015

Robert A. Glenn, Esquire
Fla. Bar No.: 159844
(pending admission pro hac vice)
Glenn, Rasmussen, et al
P. O. Box 3333
Tampa, FL 33601
T - 813/229-3333
F - 813/229-5946

Michelle Hankey, Esquire
Fla. Bar No.: 0827835
(pending admission pro hac vice)
423 Fern Street, Suite 200
West Palm Beach, FL 33401
T - 561/655-8944
F - 561/655-5269

Robert G. Kerrigan, Esquire
Fla. Bar No.: 134044
(pending admission pro hac vice)
Kerrigan, Estes, et al.
400 E. Government Street
Pensacola, FL 32501
T - 850/444-4444
F - 850/444-4493

Marcia R. Lowry, Esquire
(pending admission pro hac vice)
Children's Rights, Inc.
404 Park Avenue South, 11th Floor
New York, NY 10016
T - 212/683-2210
F - 212/683-4015

Plaintiffs and the members of the class they seek to represent

from further harm by Defendants.


Dated: Tallahassee, Florida
       August ____, 2000

                                    GIEVERS, P.A.
                                    COUNSEL for Plaintiffs
                                    524 E. College Avenue
                                    Suite 2
                                    Tallahassee, FL 32301
                                    T - 850/222-1961
                                    F - 850/222-2153


                                    _____
                                    KAREN GIEVERS
                                    Fla. Bar No.: 262005


                        Co-Counsel for Plaintiffs

Theodore Babbitt, Esquire              Robert M. Montgomery, Esquire
Fla. Bar No.:091146                    Fla. Bar No.: 056153
Babbitt, Johnson and Osborne, P.A.     Montgomery & Larmoyeux
Suite 200                              1016 Clearwater Place
1801 Australian Avenue South           West Palm Beach, FL 33401
West Palm Beach, FL 33409              T - 561/832-2880
Mailing address:                       F - 561/832-0887
P.O. Box 024426
West Palm Beach, FL 33402
T - 561/684-2500
F - 561/684-6308


Barbara C. Burch, Esquire              William M. Chanfrau, Esquire
Fla. Bar No.: 0978670                  Fla. Bar No.: 0155064
(pending admission pro hac vice)       (pending admission pro hac vice)
423 Fern Street, Suite 300             Chanfrau, Chanfrau & Bouch
West Palm Beach, FL 33401              P.O. Box 265880
T - 561/655-8944                       Daytona Beach, FL 32126
F - 561/655-5269                       T - 904/258-7313
                                       F - 904/238-1464